[No. S051847. Aug. 26, 1997.]

EARL W. KAVANAU, Plaintiff and Appellant, v.
SANTA MONICA RENT CONTROL BOARD, Defendant and
Respondent.

COUNSEL

Earl W. Kavanau, in pro. per., for Plaintiff and Appellant.

James S. Burling, R. S. Radford, Paul C. Mileck, Sherman L. Stacey, Kimball & Weiner and George Kimball as Amici Curiae on behalf of Plaintiff and Appellant.

Anthony A. Trendacosta, Ralph H. Goldsen, Doris Ganga, Karl M. Manheim, Hedges & Caldwell, David Pettit and Joan Mack for Defendant and Respondent.

Louise H. Renne, City Attorney (San Francisco), Andrew W. Schwartz, Deputy City Attorney, Richards, Watson & Gershon and Rochelle Browne as Amici Curiae on behalf of Defendant and Respondent.

OPINION

CHIN, J.—In this case, we consider the inverse condemnation claim of Earl W. Kavanau, a property owner who prevailed in a prior action against the Santa Monica Rent Control Board (Rent Board) on the ground that the rent control regulations of the City of Santa Monica (the City) violated his right to due process of law. The Court of Appeal affirmed the trial court's dismissal order, rejecting Kavanau's inverse condemnation claim because he

had not lost "all use of his property." We disagree that a property owner must lose all use of his property in order to have a viable inverse condemnation claim. Nevertheless, we conclude Kavanau is not entitled to maintain an inverse condemnation action, because he may obtain a full and adequate remedy for any interim loss flowing from the due process violation through an adjustment of future rents under the rent regulation process. Accordingly, we affirm the judgment of the Court of Appeal.

## FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Kavanau's complaint alleges as follows. In 1988, he purchased a 10-unit apartment building in the City. At that time, the building was already subject to the City's rent control law, which limited rent increases to 12 percent per year regardless of increases in landlord expenses. Between November 1, 1988, and October 31, 1989, Kavanau collected rents totaling $43,444 and spent $33,565 operating and maintaining the property, $82,934 improving the property, and $44,000 servicing debt on the property. On November 30, 1989, Kavanau applied to defendant Rent Board for rent increases on nine of the ten units in his building. The Rent Board's hearing examiner determined Kavanau was entitled to rent increases totaling approximately $35,000 per year, but required Kavanau to impose these increases over the course of eight years so as not to exceed the 12 percent limit in any one year. The hearing examiner approved rent increases for the first year totaling $5,184.

Kavanau appealed the hearing examiner's decision to the Rent Board, which upheld the decision. Kavanau then petitioned the superior court for a writ of administrative mandate, which the court denied. Kavanau appealed, and the Court of Appeal reversed. (*Kavanau* v. *Santa Monica Rent Control Bd.* (1993) 19 Cal.App.4th 730, 736 [23 Cal.Rptr.2d 724] (*Kavanau I*).)

In *Kavanau I*, the Court of Appeal concluded that the 12 percent limit on rent increases deprived Kavanau of "a just and reasonable return" and therefore was unconstitutional. (*Kavanau I*, *supra*, 19 Cal.App.4th at p. 736 & fn. 7.) The Court of Appeal directed the superior court to issue a writ of mandate prohibiting application of the 12 percent limit to his rent increase petition. (*Id.* at pp. 736-737.) We denied the Rent Board's petition for review. The Rent Board complied with the superior court's mandate.

Kavanau then filed the complaint in this case, seeking damages for temporary application of the 12 percent limit. In his first cause of action, he alleges he "has suffered a 'taking' and 'damaging' of his property rights" within the meaning of article I, section 19 of the California Constitution and the Fifth Amendment of the United States Constitution. He seeks "just

compensation" in the form of lost rental income and interest. In his second cause of action, Kavanau alleges a violation of his right to due process of law and seeks damages, including emotional distress damages, under 42 United States Code section 1983 (section 1983).

The Rent Board demurred to Kavanau's complaint, and the superior court sustained the demurrer without leave to amend. Kavanau appealed, and the Court of Appeal affirmed. The Court of Appeal noted that Kavanau had abandoned his cause of action under section 1983. As for the cause of action alleging a taking of his property requiring just compensation under the state and federal Constitutions, the Court of Appeal rejected Kavanau's claim because he never lost "all use of his property." For example, he continued to receive rents and enjoy tax benefits, and he could borrow against the property, hold it for investment, convert it to condominiums, or sell it. One justice dissented, stressing that *Kavanau I* had already decided the Rent Board had applied its regulations in an unconstitutional manner. Because Kavanau lost substantial rental income as a result of this constitutional breach, the dissenting justice argued Kavanau had suffered a taking of his property and should receive just compensation. We granted review in order to consider whether a taking occurred and what, if any, right to just compensation Kavanau might have.

### THE CITY'S RENT CONTROL LAW

■ Rent control laws must be "reasonably calculated to . . . provide landlords with a just and reasonable return on their property." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001] (*Birkenfeld*).) In order to satisfy this standard, rent control laws incorporate any of a variety of formulas for calculating rent ceilings. (See Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L.Rev. 723, 781-817 (*Guidelines*) [discussing various rent control formulas].) "Rent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula." (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297] (*Carson*).) Rather, "selection of an administrative standard by which to set rent ceilings is a task for local governments . . . and not the courts." (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 681 [209 Cal.Rptr. 682, 693 P.2d 261] (*Fisher*); cf. *Power Comm'n* v. *Pipeline Co.* (1942) 315 U.S. 575, 586 [62 S.Ct. 736, 743, 86 L.Ed. 1037] (*Pipeline Co.*) ["The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas."].)

The City uses a "maintenance of net operating income" formula for calculating rent ceilings. A typical maintenance of net operating income

formula presumes the landlord's net operating income at the time rent control began provided a just and reasonable return. In order to maintain this net operating income at a constant level, the law permits rent increases that will enable the landlord to recoup increases in ongoing operating expenses. (See *Guidelines*, *supra*, 35 Rutgers L.Rev. at pp. 809-817.) The landlord may also amortize the costs of capital improvements over the useful life of those improvements and pass those costs through to tenants. (See *id.* at pp. 817-826.) Of course, if the law holds net operating income constant, inflation will erode the real value of that income. Thus, many maintenance of net operating income formulas permit a periodic inflation adjustment. (See *Fisher*, *supra*, 37 Cal.3d at p. 683; cf. *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 289 [195 Cal.Rptr. 825] (*Cotati*).)

The City's rent control law conforms generally to this model. An April 10, 1979, amendment to the city charter (Charter) created the Rent Board and empowered it "to regulate rentals . . . so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return." (Charter, § 1800.) Pursuant to this charter amendment (Charter, § 1803(g)), the Rent Board adopted comprehensive regulations (Rent Board Regulations).

The Charter amendment rolled back most residential rents in the City to their level on April 10, 1978. (Charter, § 1804(b); Rent Bd. Regs., reg. Nos. 7000-7001.) This rollback established the base rent for individual rental units in the City. (Charter, § 1804(b).) To accommodate subsequent changes in landlord expenses, the Rent Board has since authorized various general rent adjustments and surcharges. (Charter, § 1805(a), (b); Rent Bd. Regs., reg. Nos. 3000-3106.) In addition, a landlord can petition for an individual rent adjustment in lieu of applicable general adjustments (Charter, § 1805(c); Rent Bd. Regs., reg. Nos. 4100-4114), in which case a hearing examiner receives evidence and prepares a decision, including findings of fact and law (Charter, § 1805(d); Rent Bd. Regs., reg. Nos. 4007-4020). Either party may appeal the hearing examiner's decision to the Rent Board. (Charter, § 1805(d)(10); Rent Bd. Regs., reg. No. 4021.)

The Rent Board Regulations define net operating income as gross income less operating expenses. (Rent Bd. Regs., reg. Nos. 4101(a), 4104.) The Rent Board Regulations also establish a presumption that the net operating income during the 1978 calendar year provided a landlord with a fair return. (Rent Bd. Regs., reg. No. 4102.) A landlord can rebut this presumption by showing that operating expenses during 1978 were unusually high (Rent Bd. Regs., reg. No. 4103A) or that base rent was unusually low (Rent Bd. Regs., reg. No. 4103B). A landlord is entitled not only to maintain 1978 net

operating income (Rent Bd. Regs., reg. No. 4102), but also to petition for rent increases that will increase net operating income at a rate equal to 40 percent of any increase in the consumer price index (Rent Bd. Regs., reg. No. 4106).

To establish an erosion of net operating income, and therefore entitlement to a rent increase, a landlord may present evidence of an increase in operating expenses. Under the Rent Board Regulations, operating expenses include capital improvement costs (Rent Bd. Regs., reg. No. 4101(c)(1)(viii)), but the landlord must amortize these costs over their useful life in accordance with an amortization schedule (Rent Bd. Regs., reg. No. 4041(a)-(c)).

At the time Kavanau improved his property, a landlord who had no financing costs could include an imputed interest cost as part of his capital improvement costs. (Former Rent Bd. Regs., reg. No. 4041(d).) Also at that time, a capital improvement rent increase lapsed once the amortization period ended (i.e., once the landlord had recouped all the costs associated with the improvement). (Former Rent Bd. Regs., reg. No. 4041(e).) Under current Rent Board Regulations, a capital improvement rent increase is permanent, allowing the landlord eventually to recoup more than his total cost. (Rent Bd. Regs., reg. No. 4041(c).)

The Rent Board Regulations protect tenants from sudden, large rent increases by delaying rent increases that would otherwise be permissible. At the time the Court of Appeal decided *Kavanau I*, a landlord could not increase rent more than 12 percent in any 12-month period, except in "extraordinary circumstances" such as an earthquake. (Former Rent Bd. Regs., reg. No. 4107(a), (f).) This 12 percent limit is central to the dispute in this case. Current Rent Board Regulations impose this limit only in the case of tenant hardship. (Rent Bd. Regs., reg. No. 4107(a).)

## DISCUSSION

■ Two independent constitutional protections are at issue in this case. The due process clauses of the state and federal Constitutions guarantee property owners "due process of law" when the state "deprive[s] [them] of . . . property." (Cal. Const., art. I, §§ 7, 15; U.S. Const., 14th Amend., § 1.) On the other hand, the takings clauses of the state and federal Constitutions guarantee property owners "just compensation" when their property is "taken for public use." (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.) These distinct constitutional protections limit the legislative power of government in different but related ways. The due process protection focuses on the

government's means and purpose: whether the government's method rationally furthers legitimate ends. The takings protection focuses on the impact of the government's action: whether the government has in effect appropriated private property for its own use, rather than merely regulating a private use of the property. This conceptual distinction, however, blurs somewhat in cases applying the due process and takings clauses to price regulations, including rent control. In that context, courts sometimes employ overlapping terminology and standards, treating the two clauses as a single constitutional protection of private property rights.

*Deprivation of Property Without Due Process of Law*

■    The state and federal Constitutions prohibit government from depriving a person of property without due process of law. (Cal. Const., art. I, §§ 7, 15; U.S. Const., 14th Amend., § 1.) These provisions guarantee appropriate procedural protections (see, e.g., *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287]) and also place some substantive limitations on legislative measures (see, e.g., *Washington* v. *Glucksberg* (1997) __ U.S. __ [117 S.Ct. 2302, __ L.Ed.2d __]; *U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144 [58 S.Ct. 778, 82 L.Ed. 1234]; *Nebbia* v. *New York* (1934) 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469] (*Nebbia*)). The latter guaranty—sometimes described as substantive due process—prevents government from enacting legislation that is "arbitrary" or "discriminatory" or lacks "a reasonable relation to a proper legislative purpose." (*Nebbia, supra,* 291 U.S. at p. 537 [54 S.Ct. at p. 516].)

■    In the context of price control, which includes rent control, courts generally find that a regulation bears "a reasonable relation to a proper legislative purpose" so long as the law does not deprive investors of a "fair return" and thereby become "confiscatory." (*Pipeline Co., supra,* 315 U.S. at pp. 584, 585 [62 S.Ct. at pp. 742, 743]; see also *Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 602-603 [64 S.Ct. 281, 288, 88 L.Ed. 333] (*Hope Gas*); *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 292-296 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century*); *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 816 [258 Cal.Rptr. 161, 771 P.2d 1247] (*Calfarm*); *Guidelines, supra,* 35 Rutgers L.Rev. at pp. 781-817.) Determining prices that will provide a fair return "involves a balancing of the investor and the consumer interests." (*Hope Gas, supra,* 320 U.S. at p. 603 [64 S.Ct. at p. 288].) "It is the product of expert judgment which carries a presumption of validity." (*Id.* at p. 602 [64 S.Ct. at p. 288].) A reviewing court focuses on whether the regulatory agency took relevant investor interests into account. (*Permian Basin Area Rate Cases* (1968) 390 U.S. 747, 770 [88 S.Ct. 1344, 1361-1362, 20 L.Ed.2d 312] (*Permian Basin*); *Pipeline Co., supra,* 315 U.S.

at p. 586 [62 S.Ct. at p. 743].) One of these investor interests is a "return . . . commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to . . . attract capital." (*Hope Gas, supra*, 320 U.S. at p. 603 [64 S.Ct. at p. 288].) Though due process protections generally focus on method, not result, in the context of price regulation "it is the result reached not the method employed which is controlling. [Citations.] It is not theory but the impact of the [price regulation] which counts." (*Id.* at p. 602 [64 S.Ct. at pp. 287-288].) In sum, when considering whether a price regulation violates due process, a "court must determine whether the [regulation] may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection for the relevant public interests, both existing and foreseeable." (*Permian Basin, supra*, 390 U.S. at p. 792 [88 S.Ct. at p. 1373].)

■ We applied these due process standards to rent control laws in *Fisher, supra*, 37 Cal.3d 644, *Carson, supra*, 35 Cal.3d 184, and *Birkenfeld, supra*, 17 Cal.3d 129. Though the state and federal Constitutions do not mandate a particular administrative formula for measuring fair return (*Fisher, supra*, 37 Cal.3d at p. 681), we did note certain characteristics that would weigh in favor of a finding of constitutionality. For example, due to the effects of inflation, the law "may not indefinitely *freeze* the dollar amount of . . . profits without eventually causing confiscatory results." (*Id.* at p. 683, original italics.) In addition, when a rent control law establishes a "base rent" by reference to rents on a specified date, the law should permit adjustments of that base rent for those rental units that had artificially low rents at that time. (*Birkenfeld, supra*, 17 Cal.3d at p. 168.) Similarly, the law should permit individualized rent adjustments in appropriate cases even if the base rent was not artificially low (*Fisher, supra*, 37 Cal.3d at pp. 689-690), and the procedural mechanism by which landlords may obtain any of these adjustments must not be prohibitively burdensome (*Birkenfeld, supra*, 17 Cal.3d at pp. 169-171; see also *Fisher, supra*, 37 Cal.3d at p. 690). Among other things, this process may not entail "a substantially greater incidence and degree of delay than is practically necessary." (*Birkenfeld, supra*, 17 Cal.3d at p. 169; see also *Fisher, supra*, 37 Cal.3d at p. 687.) In this regard, we recommended that the law permit "general rental adjustments for all or any class of rental units based on generally applicable factors." (*Birkenfeld, supra*, 17 Cal.3d at p. 171; see also *Fisher, supra*, 37 Cal.3d at p. 687; but see *Carson, supra*, 35 Cal.3d at p. 194.) We also indicated rent control laws should (1) allow landlords to petition for rent adjustments without having to prove building code compliance, (2) allow the governing agency to consolidate petitions for rental units in the same building, and (3) allow the governing agency to delegate hearings on petitions to hearing

officers. (*Birkenfeld, supra,* 17 Cal.3d at pp. 170-171; see also *Fisher, supra,* 37 Cal.3d at pp. 690-691.) All these characteristics would serve to reduce delay and make the petition process less burdensome to landlords, but we did not hold the state or federal Constitution required any of them per se.

Of course, the fair return principle is not limited to the property as it was when the landlord purchased it. A landlord is also entitled to a fair return on necessary capital improvements. (*Sierra Lake Reserve* v. *City of Rocklin* (9th Cir. 1991) 938 F.2d 951, 958, vacated in part (1993) 987 F.2d 662; see also *Guaranty Nat. Ins. Co.* v. *Gates* (9th Cir. 1990) 916 F.2d 508, 515.) For example, if a landlord retrofits an older building in order to comply with new building code requirements, the capital improvements may be the larger part of the building's value. In that case, if fair return did not take those capital improvements into consideration, it would be an empty promise. As the high court noted in *Duquesne Light Co.* v. *Barasch* (1989) 488 U.S. 299, 310 [109 S.Ct. 609, 617, 102 L.Ed.2d 646] (*Duquesne*), "fair rate of return" depends on "the amount of capital upon which the investors are entitled to earn that return." (See also *Hope Gas, supra,* 320 U.S. at p. 603 [64 S.Ct. at p. 288] ["return . . . should be sufficient . . . to attract capital"].) Thus, a rent control law that merely allows a landlord to recoup the bare cost of a necessary capital improvement runs the risk of being confiscatory and thereby violating the landlord's right to due process of law.

### Taking of Property Without Just Compensation

The state and federal Constitutions prohibit government from taking private property for public use without just compensation. (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.; *Chicago, Burlington &c. R'd* v. *Chicago* (1897) 166 U.S. 226, 239 [17 S.Ct. 581, 585-586, 41 L.Ed. 979] [applying the federal takings clause to the states].) In *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [43 S.Ct. 158, 160, 67 L.Ed. 322, 28 A.L.R. 1321] (*Penna. Coal*), the United States Supreme Court recognized that a regulation of property that "goes too far" may effect a taking of that property, though its title remains in private hands. In such a case, the property owner may bring an inverse condemnation action, and if it prevails, the regulatory agency must either withdraw the regulation or pay just compensation. (*First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 317, 321 [107 S.Ct. 2378, 2389, 96 L.Ed.2d 250].) Even if the agency withdraws the regulation, the property owner may have a right to just compensation for the temporary taking while the regulation was in effect. (*Id.* at p. 321 [107 S.Ct. at p. 2389] [finding this right "where the government's activities have . . . worked a taking of all use of property"].)

The United States Supreme Court has struggled to articulate a standard for when a regulation "goes too far" and effects a taking. The court has stated

broadly that the takings clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (*Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554].) Nevertheless, the court has concluded that the inquiry in any particular case is "essentially ad hoc" (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [98 S.Ct. 2646, 2659, 57 L.Ed.2d 631] (*Penn Central*)) and "a question of degree [that] ∗ . . . cannot be disposed of by general propositions" (*Penna. Coal, supra*, 260 U.S. at p. 416 [43 S.Ct. at p. 160]). The court has, however, identified "two discrete categories of regulatory action" that constitute a taking. (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798] (*Lucas*).) ■ Thus, the court has held that a permanent physical invasion of property, no matter how slight, effects a taking requiring compensation. (*Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 421 [102 S.Ct. 3164, 3168, 73 L.Ed.2d 868].) Similarly, the court has held that a regulation that deprives a property owner of "all economically beneficial or productive use of land" effects a taking requiring just compensation. (*Lucas, supra*, 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].)

A regulation, however, may effect a taking though, as is true here, it does not involve a physical invasion *and leaves the property owner some economically beneficial use of his property.* In *Lucas*, the high court expressly rejected the "assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation." (*Lucas, supra*, 505 U.S. at p. 1019, fn. 8 [112 S.Ct. at p. 2895].) "Such an owner" merely lost "the benefit of [the court's] categorical formulation." (*Ibid.*; see also *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 831 [107 S.Ct. 3141,3145-3146, 97 L.Ed.2d 677] (*Nollan*).) Of course, we held in *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25], "that a zoning ordinance may be unconstitutional . . . only when its effect is to deprive the landowner of substantially all reasonable use of his property." (See also *Fisher, supra*, 37 Cal.3d at p. 686 [paraphrasing and citing *Agins* v. *City of Tiburon*].) But the regulation at issue in *Agins* v. *City of Tiburon* left the plaintiffs a substantial use of their five-acre property, including building as many as five single-family homes on it. In order to uphold the regulation, we did not need to limit the protections of the takings clause to total deprivations of "substantially all reasonable use" of property, because the case before us did not even approach a total deprivation. Thus, our holding was dictum. Moreover, *Lucas* makes clear we misinterpreted the federal Constitution, and nothing in our opinion in *Agins* v. *City of Tiburon* suggests we were interpreting the state takings clause more narrowly than the federal

clause. Finally, even if we did intend to interpret the state right more narrowly than the federal right, the federal Constitution would nevertheless apply here to protect Kavanau.

■ When a regulation does not result in a physical invasion and does not deprive the property owner of all economic use of the property, a reviewing court must evaluate the regulation in light of the "factors" the high court discussed in *Penn Central* and subsequent cases. *Penn Central* emphasized three factors in particular: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." (*Penn Central, supra,* 438 U.S. at p. 124 [98 S.Ct. at p. 2659]; *MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 349 [106 S.Ct. 2561, 2566, 91 L.Ed.2d 285]; *Kaiser Aetna* v. *United States* (1979) 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332].) Subsequent cases, as well as a close reading of *Penn Central,* indicate other relevant factors: (1) whether the regulation "interfere[s] with interests that [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes" (*Penn Central, supra,* 438 U.S. at p. 125 [98 S.Ct. at p. 2656]); (2) whether the regulation affects the existing or traditional use of the property and thus interferes with the property owner's "primary expectation" (*id.* at pp. 125, 136 [98 S.Ct. at pp. 2659, 2665]); (3) "the nature of the State's interest in the regulation" (*Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 488 [107 S.Ct. 1232, 1243, 94 L.Ed.2d 472] (*Keystone*); see also *Mugler* v. *Kansas* (1887) 123 U.S. 623, 668-669 [8 S.Ct. 273, 300-301, 31 L.Ed. 205]) and, particularly, whether the regulation is "reasonably necessary to the effectuation of a substantial public purpose" (*Penn Central, supra,* 438 U.S. at p. 127 [98 S.Ct. at p. 2660]); (4) whether the property owner's holding is limited to the specific interest the regulation abrogates or is broader (*id.* at pp. 127-128 [98 S.Ct. at p. 2661]); (5) whether the government is acquiring "resources to permit or facilitate uniquely public functions," such as government's "entrepreneurial operations" (*id.* at pp. 128, 135 [98 S.Ct. at pp. 266, 2665]); (6) whether the regulation "permit[s the property owner] . . . to profit [and] . . . to obtain a 'reasonable return' on . . . investment" (*id.* at p. 136 [98 S.Ct. at p. 2665]); (7) whether the regulation provides the property owner benefits or rights that "mitigate whatever financial burdens the law has imposed" (*id.* at p. 137 [98 S.Ct. at p. 2666]; *Keystone, supra,* 480 U.S. at p. 491 [107 S.Ct. at p. 1245]; *Agins* v. *Tiburon, supra,* 447 U.S. at p. 262 [100 S.Ct. at p. 2142]); (8) whether the regulation "prevent[s] the best use of [the] land" (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 262); (9) whether the regulation "extinguish[es] a fundamental attribute of ownership" (*ibid.*); and (10) whether the government is demanding the property as a condition for

the granting of a permit (*Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 385 [114 S.Ct. 2309, 2316, 129 L.Ed.2d 304] (*Dolan*); *Nollan, supra*, 483 U.S. at pp. 831, 841 [107 S.Ct. at pp. 3150-3151]).

This list is not a comprehensive enumeration of all the factors that might be relevant to a takings claim, and we do not propose a single analytical method for these claims. Rather, we simply note factors the high court has found relevant in particular cases. Thus, instead of applying these factors mechanically, checking them off as it proceeds, a court should apply them as appropriate to the facts of the case it is considering. Recent Supreme Court decisions suggest a two-part analysis that considers the economic effects of the regulation and the government's purpose. (*Yee* v. *Escondido* (1992) 503 U.S. 519, 523 [112 S.Ct. 1522, 1526, 118 L.Ed.2d 153]; *Keystone, supra*, 480 U.S. at pp. 484-485 [107 S.Ct. at p. 1241].) With respect to the latter consideration, the high court has declared that a regulation of property "effects a taking if [it] does not substantially advance legitimate state interests." (*Agins* v. *Tiburon, supra*, 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; see also *Dolan, supra*, 512 U.S. at p. 385 [114 S.Ct. at p. 2316]; *Lucas, supra*, 505 U.S. at p. 1016 [112 S.Ct. at p. 2894]; *Nollan, supra*, 483 U.S. at p. 834 [107 S.Ct. at p. 3147]; *Keystone, supra*, 480 U.S. at p. 485 [107 S.Ct. at pp. 1241-1242]; *United States* v. *Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126 [106 S.Ct. 455, 458-459, 88 L.Ed.2d 419].) But, outside the context of permit condition cases such as *Nollan* and *Dolan*, the court has not clarified how it would apply this standard, and, in particular, the extent to which it would apply the standard in the same way as the similarly worded due process standard. (Cf. *Nollan, supra*, 483 U.S. at p. 834, fn. 3 [107 S.Ct. at p. 3147] [stating that the standards are "quite different"]; *Dolan, supra*, 512 U.S. at p. 391 [114 S.Ct. at p. 2319] [articulating a " 'rough proportionality' " standard for permit condition cases].)

*Penn Central, supra*, 438 U.S. 104, of course did not involve a price regulation. In the context of price regulation, the high court has sometimes employed an analysis under the takings clause similar to that which it employs under the due process clause, focusing on the regulation's impact and investors' ability to earn a fair return. In *Duquesne*, for example, an electric utility argued that electricity rates constituted a taking because the rate-setting agency did not include certain costs in the rate base. (*Duquesne, supra*, 488 U.S. at p. 305 [109 S.Ct. at p. 614].) Though the court was addressing a takings issue, it did not cite *Penn Central*. Instead, it cited due process cases, including *Permian Basin, supra*, 390 U.S. 747, *Hope Gas, supra*, 320 U.S. 591, and *Pipeline Co., supra*, 315 U.S. 575, and applied a "fair return" analysis similar to the analysis it had traditionally applied in due process cases. (*Duquesne, supra*, 488 U.S. at pp. 307-310 [109 S.Ct. at

pp. 615-617]; see also *FCC* v. *Florida Power Corp.* (1987) 480 U.S. 245, 250-254 [107 S.Ct. 1107, 1111-1113, 94 L.Ed.2d 282] (*Florida Power*) [also applying what appears to be a due process analysis when reviewing a price regulation under the takings clause]; *20th Century, supra,* 8 Cal.4th at pp. 292-296 [same]; *Cotati, supra,* 148 Cal.App.3d at p. 293 [a breach of the due process clause in the context of rent control "might well violate" the takings clause]; 2 Rotunda & Nowak, Treatise on Constitutional Law (2d ed. 1992) § 15.12, p. 505, fn. 59 ["Early Supreme Court opinions concerning utility rate regulation were written in terms of 'due process of law', but those opinions are now understood as establishing principles identical to those inherent in the takings clause . . . ."]; Brauneis, *"The Foundation of Our 'Regulatory Takings' Jurisprudence": The Myth and Meaning of Justice Holmes's Opinion in Pennsylvania Coal Co. v. Mahon* (1996) 106 Yale L.J. 613, 672, fn. 270 ["More recently, the Court has once again seemed to graft what was originally a due process test of governmental authority onto the Takings Clause . . . ."]; but see *Yee* v. *Escondido, supra,* 503 U.S. at p. 529 [112 S.Ct. at p. 1529] [suggesting that traditional takings clause jurisprudence applies to rent regulations]; *Pennell* v. *San Jose* (1988) 485 U.S. 1, 8-14 [108 S.Ct. 849, 855-859, 99 L.Ed.2d 1] [treating the takings clause and the due process clause separately when deciding a constitutional challenge to a rent control law].)

*Court of Appeal Decision in Kavanau I*

In *Kavanau I,* the Court of Appeal determined that the Rent Board's application of its 12 percent limit to Kavanau's petition for rent increases was unconstitutional. Though the court did not state whether it found a violation of Kavanau's due process rights or a taking without just compensation, the court applied a due process analysis and relied on our decisions in *Calfarm, supra,* 48 Cal.3d 805, *Fisher, supra,* 37 Cal.3d 644, and *Birkenfeld, supra,* 17 Cal.3d 129, which were all due process cases. (*Kavanau I, supra,* 19 Cal.App.4th at pp. 734-735.) Thus, we conclude the court did not find a taking.

We question some of the Court of Appeal's reasoning in *Kavanau I.* For example, that court implied that the state and federal Constitutions require application of the "fair return on investment" formula for setting rent ceilings. (*Kavanau I, supra,* 19 Cal.App.4th at pp. 733, 735; for a discussion of the fair return on investment formula, see *Guidelines, supra,* 35 Rutgers L.Rev. at pp. 790-796.) Though we have used the phrase "just and reasonable return" (*Birkenfeld, supra,* 17 Cal.3d at p. 165), we have never held that either the state or federal Constitution requires application of the fair return on investment formula or any other specific formula. (*Fisher, supra,* 37

Cal.3d at p. 681 [rejecting argument that Constitution requires application of the circular "fair return on market value" formula]; *Carson, supra,* 35 Cal.3d at p. 191.)

In addition, rather than amortizing the costs of Kavanau's capital improvements over their useful life, the Court of Appeal apparently treated those costs in the same way as ongoing operating or maintenance costs. (*Kavanau I, supra,* 19 Cal.App.4th at p. 736, fn. 7.) The court also apparently included as capital improvement costs certain expenditures the Rent Board had found unnecessary. (*Ibid.*) As a result, the court determined that Kavanau incurred a large deficit.

Moreover, the Court of Appeal assumed the City's maintenance of net operating income formula *without the 12 percent limit* established the minimum "fair return" under the state and federal Constitutions. (*Kavanau I, supra,* 19 Cal.App.4th at p. 733.) Based on this assumption, the Court of Appeal concluded the 12 percent limit put Kavanau's return below the constitutional minimum. But the court did not explain why the 12 percent limit could not be one aspect of a comprehensive scheme that as a whole provided landlords a fair return. (Cf. *Pennell* v. *San Jose, supra,* 485 U.S. at pp. 13-14 [108 S.Ct. at p. 858].) "The economic judgments required in rate proceedings are often hopelessly complex . . . . The Constitution is not designed to arbitrate these economic niceties." (*Duquesne, supra,* 488 U.S. at p. 314 [109 S.Ct. at p. 619].) Thus, courts do not "examine[] piecemeal" the "subsidiary aspects of [a state agency's] ratemaking methodology" (*id.* at p. 313 [109 S.Ct. at p. 618]), and flexibility in one part of a regulatory scheme may offset restrictiveness in another (*id.* at p. 314 [109 S.Ct. at p. 619]). We see no reason why a reasonable annual limit on rent increases cannot be consistent with a fair return.

Furthermore, the City could have prohibited certain capital improvements altogether, perhaps as a way of keeping a stock of housing available for low income residents. Thus, the City could at its option permit those capital improvements, but encourage landlords to limit their magnitude by prohibiting rent increases in excess of 12 percent per year regardless of the improvements' cost. (Cf. *Nollan, supra,* 483 U.S. at pp. 836-837 [107 S.Ct. at p. 3148].)

Finally, the essential inquiry in due process cases involving price controls is whether the regulatory scheme's *result* is just and reasonable. (*Hope Gas, supra,* 320 U.S. at p. 602 [64 S.Ct. at pp. 287-288].) The Court of Appeal did not expressly find that the 12 percent limit prevented Kavanau from " 'operating successfully.' " (*20th Century, supra,* 8 Cal.4th at p. 295.)

Rather, the 12 percent limit merely delayed Kavanau's rent increase. Regulated prices must fall within a "broad zone of reasonableness" to be constitutional (*Permian Basin, supra*, 390 U.S. at p. 770 [88 S.Ct. at p. 1361]; see also *Pipeline Co., supra*, 315 U.S. at p. 585 [62 S.Ct. at pp. 742-743]), and due process requires fundamentally a balancing of interests (*Hope Gas, supra*, 320 U.S. at p. 603 [64 S.Ct. at p. 288]). The 12 percent limit achieved this balance. It balanced landlords' interests in recouping their increased costs against tenants' interests in avoiding sudden, large rent increases. Of course, in certain circumstances—such as during times of very high inflation—a 12 percent limit on rent increases might be confiscatory, but the Court of Appeal did not adequately explain why application of the 12 percent limit to Kavanau's petition for rent increases violated his constitutional rights.

Thus we have serious doubts about the Court of Appeal's reasoning in *Kavanau I*. Nevertheless, the Court of Appeal's judgment in that case is final and precludes relitigation of certain issues in this proceeding. (See, e.g., *Perez* v. *City of San Bruno* (1980) 27 Cal.3d 875, 883 [168 Cal.Rptr. 114, 616 P.2d 1287].) For example, we must accept as true for purposes of this proceeding that application of the Rent Board's 12 percent limit on rent increases violated Kavanau's right to due process of law. Of course, Kavanau obtained a remedy in the form of a writ of mandate, but he also seeks damages.

*Kavanau's Present Claim for Damages*

■  In *Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 14 [32 Cal.Rptr.2d 244, 876 P.2d 1043], we held that, if a property owner brings a timely action to set aside or void a regulation, he may *but need not* join a claim for damages. Instead, he may bring a damages claim separately after successfully challenging the regulation. (*Id.* at pp. 7, 26.) Thus, in *Hensler* we identified an exception to the general rule against splitting claims. (See also *Healing* v. *California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1170 [27 Cal.Rptr.2d 758]; *Mata* v. *City of Los Angeles* (1993) 20 Cal.App.4th 141, 149 [24 Cal.Rptr.2d 314]; *Patrick Media Group, Inc.* v. *California Coastal Com.* (1992) 9 Cal.App.4th 592, 607 [11 Cal.Rptr.2d 824]; *Gallagher* v. *Frye* (9th Cir. 1980) 631 F.2d 127, 130.) In accordance with *Hensler*, Kavanau brought his present claim for damages, alleging two causes of action.

■  In his second cause of action, Kavanau sought damages based on the violation of his right to due process. The state and federal due process clauses, unlike the takings clauses, make no express reference to damages, but Kavanau alleged a "deprivation of . . . rights, privileges, or immunities

secured by the Constitution," entitling him to damages under section 1983. We need not determine whether section 1983 would allow Kavanau to recoup damages under the facts of this case, because he abandoned his section 1983 cause of action, choosing instead "[t]o focus attention on what [he] believes to be the important constitutional questions involved . . . [in] his first cause of action for inverse condemnation . . . ." The Court of Appeal expressly noted that Kavanau had abandoned the section 1983 cause of action, and he did not petition for rehearing. Accordingly, the only cause of action before us is Kavanau's first cause of action alleging a taking and seeking just compensation. (See Cal. Rules of Court, rule 29(b).)

Kavanau's allegations, if true, are not sufficient to establish a taking, and therefore the trial court was correct to sustain the Rent Board's demurrer. This case does not fall within either of the "two discrete categories of regulatory action" that constitute a taking. (*Lucas, supra*, 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]; *Agins* v. *Tiburon, supra*, 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) Rent control does not generally constitute a physical invasion of property (*Yee* v. *Escondido, supra*, 503 U.S. 519), and we agree with the Court of Appeal that Kavanau did not lose "all economically beneficial or productive use of" his property (*Lucas, supra*, 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]).

Nor do the factors the high court articulated in *Penn Central* and subsequent cases indicate a taking in this case. The "economic impact" (*Penn Central, supra*, 438 U.S. at p. 124 [98 S.Ct. at p. 2659]) on Kavanau of the 12 percent limit, which in effect merely delayed his rent increase, was not significant when compared to the benefits he continued to receive from his property, including significant rental income (*id.* at p. 130 [98 S.Ct. at p. 2662] [rejecting assertion that a reviewing court should consider the property interest that a regulation affects in isolation from unaffected property interests]). Similarly, the "interfere[nce] with [Kavanau's] distinct investment-backed expectations" (*id.* at p. 124 [98 S.Ct. at p. 2659]) was minor, considering he had constructive knowledge of the 12 percent limit when he chose to improve his property. Finally, the "character of the governmental action" (*ibid.*) does not compel us to find a taking.

This case does not involve a regulation that "prohibited a beneficial use to which [Kavanau's building] had previously been devoted" (*Penn Central, supra*, 438 U.S. at p. 125 [98 S.Ct. at p. 2660]), thus interfering with Kavanau's "primary expectation" (*id.* at p. 136 [98 S.Ct. at p. 2665]). Rather, the 12 percent limit affected Kavanau largely because he *changed* the use of his building by making costly capital improvements. Nor did the 12 percent limit abrogate Kavanau's entire property holding, as might occur when

someone owns only mineral rights and a land-use regulation prohibits mining those minerals. (*Penna. Coal, supra,* 260 U.S. at pp. 412-416 [43 S.Ct. at pp. 159-160]; *Penn Central, supra,* 438 U.S. at pp. 127-128 [98 S.Ct. at p. 2661].) Furthermore, by imposing the 12 percent limit, the Rent Board was not acquiring "resources to permit or facilitate uniquely public functions" such as government's "entrepreneurial operations." (*Penn Central, supra,* 438 U.S. at pp. 128, 135 [98 S.Ct. at pp. 2661, 2665].) Nor did the 12 percent limit "prevent the best use" of Kavanau's building or "extinguish a fundamental attribute of ownership." (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 262 [100 S.Ct. at p. 2142].) In addition, the Rent Board did not impose the 12 percent limit as a condition for granting a permit. (*Dolan, supra,* 512 U.S. at p. 385 [114 S.Ct. at p. 2316]; *Nollan, supra,* 483 U.S. at pp. 831, 841 [107 S.Ct. at pp. 3145-3146, 3150-3151].) Finally, the Rent Board has a "legitimate . . . interest[]" in easing the burden on tenants of sudden, large rent increases, and the 12 percent limit "substantially advance[d]" that interest. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141]; see also *Penn Central, supra,* 438 U.S. at p. 127 [98 S.Ct. at pp. 2660-2661]; *Keystone, supra,* 480 U.S. at p. 488 [107 S.Ct. at p. 1243].) Thus, the factors that have proved relevant in other takings cases do not indicate a taking in this case.

But Kavanau emphasizes the Court of Appeal's finding in *Kavanau I* that application of the 12 percent limit deprived him of a fair return and thus violated his right to due process. We must, of course, accept that finding as true for purposes of this proceeding. Put simply, Kavanau argues that, because he lost rental income as a direct result of the Rent Board's unconstitutional application of its 12 percent limit, he has suffered a taking requiring just compensation. Thus, Kavanau asks us to consider whether a rent regulation that violates a particular property owner's right to due process by depriving him of a fair return also necessarily constitutes a taking.

■■ As noted, the United States Supreme Court has declared that a regulation of property "effects a taking if [it] does not substantially advance legitimate state interests." (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) ■■ The similarity of this takings standard to the due process requirement that a regulation "have a reasonable relation to a proper legislative purpose" (*Nebbia, supra,* 291 U.S. at p. 537 [54 S.Ct. at p. 516]) supports Kavanau's argument that a due process violation in this context constitutes a taking. In fact, when the high court first articulated this takings standard, it cited *Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188 [48 S.Ct. 447, 448, 72 L.Ed. 842], a due process case. (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) Kavanau's argument might also find

some support in cases such as *Duquesne, supra,* 488 U.S. 299, *Florida Power, supra,* 480 U.S. 245, and *20th Century, supra,* 8 Cal.4th 216, which apply standards under the takings clause similar to those that apply under the due process clause.

On the other hand, the Rent Board stresses the distinct functions of the due process clause and the takings clause. The Rent Board argues that the due process protection focuses on method. It requires that a regulation not be arbitrary or capricious and that the regulatory agency give due consideration to conflicting interests. The takings protection focuses on result. According to the Rent Board, a taking occurs only in cases of " 'deep financial hardship' " (*20th Century, supra,* 8 Cal.4th at p. 258) or when a regulation deprives a property owner of nearly all use of the property (*Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893]). The Rent Board asserts we should no more treat a due process violation affecting property as a taking than we would treat an equal protection or free speech violation affecting property as a taking.

In this case, we need not decide whether a rent regulation that violates a particular property owner's right to due process also constitutes a taking, because, assuming it otherwise might, we hold that a remedy for the due process violation, if available and adequate, obviates a finding of a taking. ■ In a variety of contexts, the Supreme Court has recognized that the benefits a property owner receives in conjunction with a regulation may offset the burdens and thus satisfy the takings clause. (*Penn Central, supra,* 438 U.S. at p. 137 [98 S.Ct. at p. 2666]; see generally, Kendall & Ryan, *"Paying" for the Change: Using Eminent Domain to Secure Exactions and Sidestep Nollan and Dolan* (1995) 81 Va. L.Rev. 1801, 1837-1842; Costonis, *"Fair" Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies* (1975) 75 Colum. L.Rev. 1021, 1039-1042.) Thus, in *Penna. Coal,* Justice Holmes noted the "average reciprocity of advantage" that often characterizes regulations and justifies them for purposes of the takings clause. (*Penna. Coal, supra,* 260 U.S. at p. 415 [43 S.Ct. at p. 160].) More explicitly, the court has long held that the special benefits conferred on a property owner's remaining property as a direct result of a taking may constitute just compensation. (*Bauman* v. *Ross* (1897) 167 U.S. 548 [17 S.Ct. 966, 42 L.Ed. 270].) *Bauman* involved the taking of private property to build a highway in the District of Columbia. The court stated: "The Constitution of the United States contains no express prohibition against considering benefits in estimating the just compensation to be paid for private property taken for the public use; and . . . no such prohibition can be implied . . . ." (*Id.* at p. 584 [17 S.Ct. at p. 980].) Similarly, a government agency may "mitigate . . . [the] financial burdens"

of a land-use regulation, and thus avoid a takings clause violation, by transferring development rights to the property owner's other parcels. (*Penn Central, supra,* 438 U.S. at p. 137 [98 S.Ct. at p. 2666]; see also *MacDonald, Sommer & Frates* v. *Yolo County, supra,* 477 U.S. at p. 350 [106 L.Ed.2d at pp. 2566-2567]; cf. *Suitum* v. *Tahoe Regional Planning Agency* (1997) __ U.S. __, __ [117 S.Ct. 1659, 1662, 137 L.Ed.2d 980] [not deciding whether the sale value of transferable development rights is relevant to the existence of a taking or only to the adequacy of the compensation].) **(9c)** Consistent with the reasoning of these cases, when a due process violation is the sole basis of an asserted taking, a remedy for the due process violation, if available and adequate, is a valuable benefit that satisfies the takings clause. (Cf. *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 194-197 [105 S.Ct. 3108, 3120-3121, 87 L.Ed.2d 126] [state law inverse condemnation remedy may be adequate compensation for purposes of takings clause]; *Ruckelshaus* v. *Monsanto Co.* (1984) 467 U.S. 986, 1019 [104 S.Ct. 2862, 2881, 81 L.Ed.2d 815] [Tucker Act remedy may be adequate compensation for purposes of takings clause]; *Regional Rail Reorganization Act Cases* (1974) 419 U.S. 102, 136, 150, 155-156 [95 S.Ct. 335, 355, 362, 364-365, 42 L.Ed.2d 320] [same].)

Under the due process clause, future rent ceilings must enable Kavanau to earn a fair return that will "maintain financial integrity, attract necessary capital, and fairly compensate [him] for the risks [he has] assumed." (*Permian Basin, supra,* 390 U.S. at p. 792 [88 S.Ct. at p. 1373].) Among other things, this standard requires the Rent Board to consider, when setting rent ceilings, Kavanau's costs, which include certain costs associated with rent control. (Civ. Code, § 1947.15 [stating circumstances in which rent control agencies must consider the cost to a landlord of professional services associated with rent control].) We think one of the costs associated with rent control that the Rent Board must consider is the cost to Kavanau of any confiscatory rent ceilings the Rent Board previously imposed on the apartments in question. (Cf. *Communications Satellite Corp.* v. *F. C. C.* (D.C. Cir. 1977) 611 F.2d 883, 894 & fn. 19 [198 App.D.C. 60] [past deficiency "may *not* be capitalized into the rate base for future years" unless "rates . . . have for some time been under strictures set by an administrative agency" and the deficiency is the result of agency "miscalculation"].) Thus, irrespective of whether section 1983 would have afforded Kavanau a remedy for the due process violation, his continuing right to an adjustment of future rents can provide an adequate remedy.

An adjustment of future rents that takes into consideration past confiscatory rents is the converse of the refund that producers in price-regulated industries may have to pay if, during litigation over price levels, they charge

prices that a court later determines to be excessive. (See, e.g., *Trans Alaska Pipeline Rate Cases* (1978) 436 U.S. 631, 655 [98 S.Ct. 2053, 2066-2067, 56 L.Ed.2d 591].) Moreover, this remedy, as opposed to an award of damages against the Rent Board, places the cost of compensating Kavanau roughly on those tenants who benefited from unconstitutionally low rents. (Cf. *State of California* v. *Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472-473 [224 Cal.Rptr. 605, 715 P.2d 564] [antitrust class action applying "fluid recovery" whereby fund roughly benefits those who suffered damages]; *Blue Chip Stamps* v. *Superior Court* (1976) 18 Cal.3d 381, 388, fn. 1 [134 Cal.Rptr. 393, 556 P.2d 755] (conc. opn. of Tobriner, J.) [price reduction as remedy for overcharges].) We note in this regard that if any of Kavanau's tenants has vacated an apartment, then state law may have authorized Kavanau to set the rent for his new tenants at a level that enabled him, or will enable him, to recoup past losses. (Civ. Code, §§ 1954.50-1954.53.) In that case, he would not be entitled to an additional rent adjustment. Thus, in practice, future rent adjustments are likely to affect only those tenants who have not moved and who benefited from unconstitutionally low rents.

Finally, the remedy of future rent adjustments avoids putting a reviewing court in the position of declaring the appropriate regulated rent ceiling for a particular apartment in order to measure damages. (Cf. *United States* v. *Western Pac. R. Co.* (1956) 352 U.S. 59, 63-64 [77 S.Ct. 161, 165, 1 L.Ed.2d 126] [deferring to the "primary jurisdiction" of an administrative agency "whenever enforcement of the claim requires the resolution of issues which . . . have been placed within the special competence of an administrative body"].) Setting rent ceilings is essentially a legislative task, and agencies, not courts, choose which administrative formula to apply. (*Fisher, supra,* 37 Cal.3d at p. 681.) The state and federal Constitutions require only a fair process that reasonably takes into consideration the landlord's interests, and a landlord's return need only fall within a "broad zone of reasonableness." (*Permian Basin, supra,* 390 U.S. at p. 770 [88 S.Ct. at p. 1361]). Accordingly, courts are in no position to determine the appropriate rent ceiling for an apartment as a means of assessing damages. We strongly resist any rule that would impose on a reviewing court the impossible task of finding somewhere in the penumbra of the Constitution a stipulation that a particular apartment in a particular building should rent for $746 per month rather than $745.

Here, the City's rent control scheme is sufficiently flexible to permit the Rent Board to consider past confiscatory rent ceilings when evaluating a landlord's petition for a rent increase. (Charter, § 1805(e).) Kavanau, of course, is not necessarily entitled to rent increases equal to the exact amount by which his past rents fell below some imagined constitutional minimum.

Rather, he is merely entitled to future rent ceilings that will "maintain financial integrity, attract necessary capital, and fairly compensate [him] for the risks [he has] assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." (*Permian Basin, supra*, 390 U.S. at p. 792 [88 S.Ct. at p. 1373].) But, in measuring the future rent ceiling for a particular apartment, the Rent Board must take into consideration the effect on Kavanau, if any, of the temporary enforcement of its confiscatory regulation with respect to that apartment. In this regard, we note Kavanau's actual loss in this case may be small or nonexistent. For example, the Rent Board arguably could have satisfied the *Kavanau I* mandate by waiving the 12 percent limit, but imposing a higher limit, under some other regulatory provision, that adequately accommodated Kavanau's interest in a fair return. If, in response to *Kavanau I*, the Rent Board allowed Kavanau to increase rent in accordance with its maintenance of net operating income formula, but without *any* annual limit, it may already have enabled Kavanau to recoup his losses. In addition, the 12 percent limit was not confiscatory to the extent market conditions would have prevented Kavanau from increasing rent more than 12 percent even if the Rent Board had not enforced the limit.

Kavanau asserts he would have to double his rents in order to recoup his losses within a reasonable period of time. He points out that he operates in a competitive environment, and he argues that future rent adjustments are an inadequate remedy because they will price his apartments above market levels and leave him with an empty building. If Kavanau's assertion is true, then those same market forces might well have prevented Kavanau from increasing his rents regardless of the 12 percent limit. The Constitution does not protect investors from the risks inherent in the marketplace. In addition, Kavanau does not persuade us that his losses, if any, are so great as to prevent him from recouping them through future rent adjustments. In fact, Kavanau conceded at oral argument that his rents remained well below free market levels even with the full increase he sought. Moreover, if a landlord acts promptly to challenge a confiscatory regulation, and seeks a stay of that regulation during litigation, his losses, and thus any future rent adjustments, are likely to be relatively small. A landlord who unnecessarily permits large losses to accumulate cannot complain if the market prevents him from recouping those losses. Finally, we do not here decide what alternative remedy might be appropriate if a landlord can establish that the remedy of future rent adjustments is for some reason unavailable. But before Kavanau can allege the unavailability of future rent adjustments, he must petition for those adjustments, the Rent Board must determine, subject to judicial review, their appropriate amount, and he must attempt to impose them.

Just as a reviewing court averages the effects of subsidiary aspects of a price-setting scheme by looking at "net effect" (*Duquesne, supra*, 488 U.S. at

p. 314 [109 S.Ct. at p. 619]), a reviewing court can also average the effects of a price-setting scheme over time. Thus, a fair return over the course of several years will offset a confiscatory return during a particular year. Recognizing that Kavanau has a continuing right under the due process clause to future rent adjustments that will enable him to earn a fair return, we believe he has not suffered a taking. Put another way, the ongoing process of setting rent ceilings dispels the due process violation, which in this case is the sole basis for a potential takings clause violation. (Cf. *Mountain Water* v. *Mont. Dept. of Public Serv. Reg.* (9th Cir. 1990) 919 F.2d 593, 601 [no violation of Constitution because water utility "may seek just compensation for its property taken through [future] rate setting"].) Accordingly, we agree with the trial court and the Court of Appeal that Kavanau has not stated a viable inverse condemnation claim.

### CONCLUSION

*Kavanau I* determined that application of the Rent Board's 12 percent limit on rent increases violated Kavanau's right to due process. The remedy of future rent adjustments available to Kavanau under the due process clause precludes a finding of a taking in this case. Accordingly, we affirm the judgment of the Court of Appeal.

George, C. J., Mosk, J., Kennard, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the majority opinion. I write separately to attempt further clarification of the relationship between due process and takings jurisprudence in the context of rent control and rate regulation generally.

The term "due process" has at least two distinct meanings or applications in the field of rate regulation: (1) substantive due process, i.e., whether the scheme of regulation in question is " ' "arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt . . . ." ' " (*Pennell* v. *San Jose* (1988) 485 U.S. 1, 11 [108 S.Ct. 849, 857, 99 L.Ed.2d 1] (*Pennell*)); (2) what can be termed "confiscatory" due process, i.e., whether a given scheme of rate regulation, although not per se or facially invalid, is confiscatory in its *result* and has prevented an opportunity to obtain a just and reasonable rate of return on investment. (See *Duquesne Light Co.* v. *Barasch* (1989) 488 U.S. 299, 307-308 [109 S.Ct. 609, 615, 102 L.Ed.2d 646] (*Duquesne Light Co.*).) As explained below, it is this latter confiscatory due process analysis that significantly overlaps the takings clause.

Substantive due process analysis of price and rate regulation is fairly straightforward. Price regulation is presumed to be constitutional, and " 'The

burden of proving' otherwise 'rests on the party asserting the violation . . . .' [Citation.] It 'is not easily met. For the last half-century, courts have upheld challenged governmental acts *unless no reasonably conceivable set of facts could establish a rational relationship* between the regulation and the government's legitimate ends.' [Citation.] 'It is enough that there is an evil at hand for correction, and that it might be thought that the particular . . . measure was a rational way to correct it.'" (*20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 292 [32 Cal.Rptr.2d 807, 878 P.2d 566], italics added (*20th Century Ins. Co.*).)

Rent control is simply a form of price control. "For constitutional purposes rent control is indistinguishable from other types of governmental price regulation. Despite the permanence and concreteness of real property, and the special place accorded it by the common law and expounded by the early commentators, its commercial use is no less subject to regulation under the police power than other, more ephemeral, goods and services. . . . To ascertain the limitations imposed by the . . . federal constitution[ ] upon municipal efforts to regulate rents, it is therefore appropriate to consider the constitutional limits on governmental regulation of prices generally." (*Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 7-8], fn. omitted.)

As the United States Supreme Court affirmed in *Pennell*, a rent control case: "[W]e have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare." (*Pennell, supra*, 485 U.S. at p. 13 [108 S.Ct. at p. 858].) Thus, that court upheld a facial challenge to a rent control ordinance that "represents a rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment." (*Ibid.*) Accordingly, the notion advanced by some commentators (see Radford, *Regulatory Takings Law in the 1990's: The Death of Rent Control?* (1992) 21 Sw.U.L.Rev. 1019) that rent control laws are subject to a heightened constitutional scrutiny that goes beyond the substantive due process "rational relationship" analysis to which other economic regulation is subject, is without constitutional basis. Nor is it constitutionally sound to assert that a trial court, sitting as trier of fact, may act as a kind of "Super City Council" that can evaluate whether a rent control law has been successful in achieving its stated purposes. (See *ibid.*) A trial court may not arrogate to itself such a role. Neither may an appellate court. "In a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purpose, but instead look to whether " ' "the governmental body *could* have had no legitimate reason for its decision." ' " (*Kawaoka* v. *City of Arroyo Grande* (9th Cir. 1994) 17 F.3d

1227, 1234, italics in original.) Whether rent control is the best way to remedy the problem of excessive rents in a given locale, and whether the benefits it brings in terms of lower-than-market rents for some tenants outweigh its costs, is a matter to be addressed to legislative bodies.[1]

Although a government agency's capacity under the police power to regulate rents in some manner is seldom in doubt, the particular form the regulation takes will not pass constitutional scrutiny if it is confiscatory. This confiscatory analysis, although it also goes under the rubric of "due process," is substantially different from the substantive due process analysis discussed immediately above. The fixing of a " 'just and reasonable' rate[] involves a balancing of the investor and the consumer interests. . . . [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated." (*Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 603 [64 S.Ct. 281, 288, 88 L.Ed. 333] (*Hope*).) In determining a just and reasonable rate, "it is the result reached not the method employed which is controlling. [Citations.] It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." (*Id.* at p. 602 [64 S.Ct. at pp.

---

[1]The notion that rent control laws may now be subject to a more exacting form of constitutional scrutiny is predicated on a reading of *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677]. (See Radford, *Regulatory Takings Law in the 1990's: The Death of Rent Control?, supra,* 22 Sw.U.L.Rev. at p. 1030.) We have rejected elsewhere the contention that *Nollan* and the related case of *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [114 S.Ct. 2309, 129 L.Ed.2d 304] represent a new standard of scrutiny of government regulation other than those regulations that require either a physical dedication of property, or a development fee levied on an "individual and discretionary basis." (*Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 876 [50 Cal.Rptr.2d 242, 911 P.2d 429].) In the present case, rent control neither requires a physical dedication nor amounts to an individual and discretionary development fee. Indeed, as explained above, it is not a land-use regulation at all but a form of price control.

Moreover, the fact that the *Pennell* decision, which postdates *Nollan*, relies on traditional substantive due process analysis in determining whether a rent control law is within a city's police power (*Pennell, supra,* 485 U.S. at pp. 11-12 [108 S.Ct. at p. 857]) indicates that *Nollan* does nothing to undermine the fundamental constitutional validity of rent control laws. "[W]e have 'consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.' " (*Pennell, supra,* 485 U.S. at p. 12, fn. 6 [108 S.Ct. at p. 857].) In short, nothing in recent Supreme Court case law indicates an intent to replace the traditionally deferential substantive due process standard with some heightened takings standard when reviewing the basic validity of a rent control law or other form of price regulation. And the mere fact that a plaintiff chooses to label his or her action as a suit for just compensation after a "taking," when it is in essence a substantive due process challenge to an economic regulation, is without constitutional significance.

287-288].) Thus in *Hope*, for example, Justice Douglas discussed the utility's historical earnings and financial status in considerable detail and concluded that it was able to maintain its "financial integrity." (*Hope, supra*, 320 U.S. at pp. 604-605 [64 S.Ct. at p. 289].) The court more recently did the same in *Duquesne Light Co., supra*, 488 U.S. at page 312 [109 S.Ct. at page 618].

Some rent control cases speak of confiscatory regulations without engaging in "end result" analysis. (See *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) In *Birkenfeld*, we found that Berkeley's rent control law, as then drafted, was partly unconstitutional because it failed to make adequate provision for adjusting base rents. (*Id.* at p. 169.) Although *Birkenfeld* used the language of confiscation, it is in fact closer to substantive due process analysis. As we stated: "The provisions [of a rent control law] are within the police power if they are reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property. However, if it is apparent from the face of the provisions that their effect will necessarily be to lower rents more than could reasonably be considered to be required for the measure's stated purpose, they are unconstitutionally confiscatory." (*Id.* at p. 165.) Turning to Berkeley's rent control scheme, we concluded that "Here the [law] drastically and unnecessarily restricts the rent control board's power to adjust rents, thereby making inevitable the arbitrary imposition of unreasonably low rent ceilings." (*Id.* at p. 169.) Thus, this particular feature of Berkeley's scheme was deemed to be constitutionally invalid not because its end result was actually "confiscatory," in the sense in which *Hope* and its progeny employ that term, but because it was arbitrary and could not be rationally related to the legitimate state purpose of "eliminat[ing] excessive rents and at the same time provid[ing] landlords with a just and reasonable return on their property." (*Birkenfeld, supra*, 17 Cal.3d at p. 165.)

Similarly, regulation that set rates for insurers at less than a fair rate of return in order to compensate for supposedly excess profits was determined to be a violation of due process in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 819 [258 Cal.Rptr. 161, 771 P.2d 1247]. "[T]he concept that rates may be set at less than a fair rate of return in order to compel the return of past surpluses is not one supported by precedent." (*Ibid.*) Again, this aspect of the law was declared unconstitutional because it failed to pursue a legitimate state purpose—an essentially substantive due process violation—not because it resulted in fact in the undermining of the financial integrity of the various insurance companies.

In *Duquesne Light Co., supra*, 488 U.S. 299, the court appeared to use the terms "due process" and "taking" interchangeably in referring to utility rate

regulation that is confiscatory and therefore constitutionally defective. As the court stated, "[t]he guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory. *Covington & Lexington Turnpike Road Co.* v. *Sanford*, 164 U. S. 578, 597 (1896) [17 S.Ct. 198, 205, 41 L.Ed. 560] (A rate is too low if it is 'so unjust as to destroy the value of [the] property for all the purposes for which it was acquired,' and in so doing 'practically deprive[s] the owner of property without *due process of law*'); [citations]. If the rate does not afford sufficient compensation, the State has *taken* the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." (*Duquesne Light Co., supra*, 488 U.S. at pp. 307-308 [109 S.Ct. at p. 615], italics added.) However, it is clear that the *Duquesne Light Co.*'s equation of the two constitutional provisions was made only in reference to rate regulations that are confiscatory in their end result. (*Duquesne Light Co., supra*, 488 U.S. at p. 310 [109 S.Ct. at p. 617].) In other words, a rate regulation is judged to be a taking when its effect has been actually confiscatory, not when it violates substantive due process. As has been stated, "[A]bsent . . . deep financial hardship [of a regulated public utility], there is no taking, and . . . no obligation to compensate . . . ." (*Jersey Cent. Power & Light Co.* v. *F.E.R.C* (D.C. Cir. 1987) 810 F.2d 1168, 1181, fn. 3 [258 App.D.C. 189]; accord, *20th Century Ins. Co., supra*, 8 Cal.4th at p. 297.)

The notion that a price regulation that leads to the actual confiscation of property is a "taking" of that property is congruent with the Supreme Court's evolving takings jurisprudence in the field of land use law, wherein the impact of land use regulation, either in economic terms or in terms of physical intrusion on real property, is paramount in any takings analysis. (See *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015-1016 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798].) But nothing in the land-use cases, or in *Duquesne Light Co.*, suggests that any regulation that violates *substantive* due process is a taking for which just compensation must be paid.[2]

In the present case, the basis of the Court of Appeal's holding in the original *Kavanau* decision (see *Kavanau* v. *Santa Monica Rent Control Bd.*

---

[2]It is admittedly true that Supreme Court precedent is not entirely clear on where substantive due process ends and takings law begins. In the area of land-use regulation, the court has held that a general zoning law is a taking of property if it "does not substantially advance legitimate state interests." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106].) Whether and to what extent this standard differs from the ordinary substantive due process "rationally related" standard is a question beyond the scope of this opinion. The "substantially advance" standard has not been applied by the Supreme Court outside the special area of forced dedications of property in exchange for development permits. (See *Nollan* v. *California Coastal Comm'n, supra*, 483 U.S. 825; *Dolan* v. *City of Tigard, supra*, 512 U.S. 374.) In any case, the Supreme Court has not indicated any intent to

(1993) 19 Cal.App.4th 730 [23 Cal.Rptr.2d 724] (*Kavanau I*)) is unclear. The opinion can be read as a substantive due process case, concluding that the 12 percent cap found in the Santa Monica ordinance is arbitrary. As the majority herein explain, however, there is no reason why a 12 percent cap cannot "be one aspect of a comprehensive scheme that as a whole provide[s] landlords a fair return." (Maj. opn., *ante*, at p. 778.) It appears from the dollar figures alleged in Earl W. Kavanau's complaint and stated in the majority opinion (maj. opn., *ante*, at p. 767), that Kavanau may have made a bad business decision purchasing the rental property in question, since the amount of debt service and operating expenses exceed rental income. These facts on their face do not indicate a constitutional violation. " 'A regulated firm has no constitutional right to a profit.' " (*20th Century Ins. Co.*, *supra*, 8 Cal.4th at p. 294, brackets omitted.) Although, as the majority point out, we are bound by the law of the case to the Court of Appeal's conclusion that a 12 percent cap was arbitrary, this conclusion does not signify that Kavanau was in fact subject to "deep financial hardship" as the result of the rent regulation. The judgment of the *Kavanau I* court does not translate into the claim that Kavanau deserves just compensation under the Fifth Amendment to the United States Constitution.

As the majority properly conclude, the cost of past confiscatory rent regulation is "one of the costs associated with rent control that the Rent Board must consider" in setting a present just and reasonable rent. (Maj. opn., *ante*, at p. 783.) If Kavanau can establish not only that the 12 percent cap was arbitrary, but that as the result of its imposition, he in fact suffered a sustained period of financial hardship that defeated any reasonable investment-backed expectation for the market in which he operated, then he may be entitled to a rate increase that compensates for such a confiscatory rate. But since, even if *Kavanau I* is taken at face value, it is far from clear that the result of the Santa Monica Rent Control Board's rate order was the actual imposition of an unfairly low rate of return, and since the post-*Kavanau I* remedy may have adequately compensated Kavanau for whatever supposed losses he suffered at the hands of the rent board, the majority is correct to conclude that Kavanau may not be entitled to any further rent readjustment. (See maj. opn., *ante*, at pp. 785-786.)

There is yet another reason why a landlord's claim for damages would be, at the very least, vitiated under a scheme of rent regulation. As I stated in my concurring opinion in *20th Century Ins. Co.*, *supra*, 8 Cal.4th at page 330, it is evidently the case that " '[a] property owner must be legally compelled to engage in price-regulated activity for regulations to give rise to a taking.

extend the "substantially advance" test beyond the realm of zoning and similar laws which restrict the use of land, and has not applied such a test to price regulations. (See fn. 1, *ante*).

[Citations.] For example, public utilities generally are under a state statutory duty to serve the public, and must furnish "service on demand to all applicants" at government-determined rates. [Citations.] Because utilities generally are compelled to employ their property to provide services to the public, the Fifth Amendment requires regulators to provide utilities with reasonable compensation for their services. [Citations.] [¶] By contrast, where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking.' " A "voluntary" participation in a price-regulated program is said to occur when an individual or company has the " 'right to withdraw' therefrom." (*Id.* at p. 331.)

Thus, one who persists in engaging in a regulated activity over an extended period of time, when withdrawal from that activity is an option, cannot lay at the doorstep of government regulation the reason for its economic failure. Government regulation may indeed place some firms in financial jeopardy, but that in itself does not give rise to a constitutional violation when the government does not block the outflow of assets from these no-longer-profitable enterprises. Some features of the rate regulation may be a violation of substantive due process if they cannot be said to be part of a rational regulatory scheme, and these would therefore be subject to invalidation through injunctive and declaratory relief. But it does not follow that one who has a right to withdraw his capital from the regulated enterprise in question may press a damages claim against the government, either a just compensation claim for a taking or a statutory claim for damages under section 1983 of title 42 of the United States Code. It appears doubtful therefore that a landlord who is subject to lower-than-reasonable rents, and has the option of withdrawing from the rental market, or recouping his previous losses prospectively through a compensatory rent order, can ever press such a claim.

BAXTER, J.—I respectfully dissent from the majority's holding that a compensable taking cannot occur even though the government, acting through its rent control board, deprives a landlord of the opportunity to earn a fair and reasonable return on the landlord's property through unconstitutional and confiscatory application of its rent control regulations. I share Justice Croskey's view, expressed in his dissent below: "I can perceive of no reason in law or logic why a confiscatory rent control regulation, found to be unconstitutional on due process grounds, would not result in a compensable taking if it were nevertheless enforced and a monetary deprivation resulted. I can imagine no clearer example of a case where compensation should be paid than where the government has *illegally* taken or diverted to its own social goals the private property of one of its citizens. Indeed, such a

common sense result and statement of principle should need no citation of authority."

In a decision now final (*Kavanau v. Santa Monica Rent Control Bd.* (1993) 19 Cal.App.4th 730 [23 Cal.Rptr.2d 724] (*Kavanau I*), the Court of Appeal held that, as a result of the constitutionally impermissible action of defendant Santa Monica Rent Control Board, plaintiff was denied a fair and reasonable return on his rental property. As a result he allegedly suffered damages of $113,095 as of the date of his complaint. He sought to recover that amount plus interest, attorney fees, costs, and other sums from the governmental body responsible for his loss, the Santa Monica Rent Control Board (the Board), in a complaint stating a cause of action in inverse condemnation. His complaint was dismissed. The Court of Appeal affirmed the trial court judgment and a majority of this court now affirms that judgment on the grounds that plaintiff's allegations, if true, do not establish a taking and, even if the Board's action denied him due process because it denied him a fair return on his property, he has another remedy—increased rents—by which means third parties may eventually reimburse him for what the Board allegedly took from him.

The majority err. There has been a taking of a substantial property right—plaintiff's right to seek a fair and reasonable return from his property. Plaintiff has both a federal and a state constitutional right to recover the loss he suffered as a result of that taking from the Board. By mandating rents so low that its action denied plaintiff due process of law, the Board took from him a significant stick in the bundle of sticks that together constitute ownership of real property (see *Kaiser Aetna v. United States* (1979) 444 U.S. 164, 176 [100 S.Ct. 383, 391, 62 L.Ed.2d 332])—the opportunity to earn a reasonable return on his property. Since the rent ceiling imposed by the Board denied plaintiff the reasonable return his property would otherwise have earned, it necessarily denied plaintiff economically productive use of his rental property and to that extent took a right to which he was constitutionally entitled. Under both the Fifth and Fourteenth Amendments to the United States Constitution (Fifth Amendment) and article I, section 19 of the California Constitution (article I, section 19), plaintiff must be compensated for that taking by the governmental entity that took his property. It is not sufficient that he is permitted to raise the rent paid by his tenants from which increases he may eventually recoup his losses.

I

THE "TAKINGS" CLAUSE AND RENT CONTROL

The Fifth Amendment takings clause, incorporated into and made applicable to the states by the Fourteenth Amendment (*Chicago, Burlington &c.*

R'd v. Chicago (1897) 166 U.S. 226, 239 [17 S.Ct. 581, 585, 41 L.Ed. 979]), provides, inter alia, that "private property [shall not] be taken for public use without just compensation." Article I, section 19 contains a similar command, providing inter alia, "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." When the government fails to meet its constitutional obligation under these provisions, an action in inverse condemnation lies against the government to recover "just compensation." (Customer Co. v. City of Sacramento (1995) 10 Cal.4th 368, 377, fn. 4 [41 Cal.Rptr.2d 658, 895 P.2d 900].) And, even though the confiscatory rent ceiling imposed on plaintiff has been judicially invalidated, compensation must be paid for the income he lost while the impermissible rent ceiling was in effect, a period during which there was a "temporary taking." (First Lutheran Church v. Los Angeles County (1987) 482 U.S. 304, 321 [107 S.Ct. 2378, 2389, 96 L.Ed.2d 250].)

The Board may not avoid either a finding that there has been a taking or the obligation to pay constitutionally mandated compensation on speculation that plaintiff's loss may be reduced at some time in the future by increased rent paid by tenants who benefited from the reduced rent or, if those tenants leave, by new tenants who pay market rate rent. The question of whether there has been a taking must be decided independently of the value for just compensation purposes of any future monetary recovery from third parties allowed the owner whose property has been taken. (Suitum v. Tahoe Regional Planning Agency (1997) __ U.S. __ [117 S.Ct. 1659, 137 L.Ed.2d 980].)

The majority assume, but are reluctant to decide, whether a rent regulation which, as applied, denies a property owner due process constitutes a taking within the meaning of the Fifth Amendment and article I, section 19. I do not share that reluctance and I disagree with the view that there has been no taking in this case. I would hold that, because the rent regulation was adjudicated in Kavanau I to be so arbitrary as to deny due process by preventing plaintiff from earning a fair and reasonable return on the property, a taking occurred for which just compensation must be paid by the Board.

The interests which enjoy constitutional protection as "property" are generally defined by state law. (Civ. Code, § 755; Lucas v. South Carolina Coastal Council (1992) 505 U.S. 1003, 1030 [112 S.Ct. 2886, 2901, 120 L.Ed.2d 798].) In California "[t]he right to acquire and possess property, guaranteed by the constitution, includes the right to dispose of it, or any part of it, and for that purpose to divide it in any possible manner, either by

separating it into estates for successive periods or otherwise, and to dispose of one or more of such estates." (*Tennant* v. *John Tennant Memorial Home* (1914) 167 Cal. 570, 575 [140 P. 242]; *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 88 [191 Cal.Rptr. 47].) Just as that right encompasses the power to grant a license to use a portion of the owner's property temporarily (see *Ex Parte Quarg* (1906) 149 Cal. 79 [84 P. 766] [theater ticket]), it includes the right to create a leasehold estate.

Because the Board has not appropriated or physically invaded plaintiff's property, his claim is that there was a "regulatory taking," a restriction on his use of the property that went "too far" (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [43 S.Ct. 158, 160, 67 L.Ed. 322, 28 A.L.R. 1321] (*Penna. Coal*)), during the period for which he seeks damages. There was a "temporary taking." The contrary conclusion implicit in the majority opinion is foreclosed by the final judgment of the Court of Appeal in *Kavanau I*, *supra*, 19 Cal.App.4th 730. The majority err both factually and legally therefore when they hold that there has been no taking because application of the Santa Monica rent control ordinance has not denied plaintiff " 'all economically beneficial or productive use of' his property." (Maj. opn., *ante*, at p. 780.) The Board did deny plaintiff all economically beneficial use of his property.

The legal conclusion that a taking occurred during the time that plaintiff was denied a fair and reasonable return on his rental property cannot be avoided under the United States Supreme Court precedent on which the majority rely. As the majority recognize, a regulatory taking may occur in a variety of contexts. The Supreme Court has identified many, implicitly concluding in some that because the governmental restriction went "too far," the property owner had been unfairly called upon to sacrifice a property interest for the benefit of the public in circumstances in which the burden should be shared by the public as a whole. While the contexts in which the court has found a regulatory taking or rejected a taking claim differ, a common thread runs through the analysis. Although phrased somewhat differently in the court's various decisions, the economic impact of the regulation on the property owner has been a determinative factor. When the regulation denies the owner economically productive use of the owner's property for its customary use, the regulation goes too far. It is irrelevant in those circumstances that the regulation furthers or is necessary to accomplish a legitimate public purpose that is otherwise within the police power of the government. A taking occurs for which just compensation must be paid.

"[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to

leave his property economically idle," a taking occurs. (*Lucas* v. *South Carolina Coastal Council, supra,* 505 U.S. at p. 1019 [112 S.Ct. at p. 2895], fn. omitted.) The same is true if a regulation deprives the owner of economic use to the extent that the owner is unfairly singled out to bear a burden that should be borne by the public as a whole. (*Yee* v. *Escondido* (1992) 503 U.S. 519, 522-523 [112 S.Ct. 1522, 1526, 118 L.Ed.2d 153.)[1] A taking also occurs if a land-use regulation extinguishes a fundamental attribute of ownership. (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 262 [100 S.Ct. 2138, 2142, 65 L.Ed.2d 106]; *Kaiser Aetna* v. *United States, supra,* 444 U.S. at pp. 179-180 [100 S.Ct. at pp. 393].)

The takings clause necessarily applies to rent control ordinances which affect the ability of a property owner to earn a fair return on property which is generally used for rental purposes since the regulations restrict both the owner's fundamental right to create leasehold estates and the owner's right to make economically productive use of the property. The Fifth Amendment takings clause "is addressed to every sort of interest the citizen may possess," including leasehold interests. (*U.S.* v. *General Motors Corp.* (1945) 323 U.S. 373, 378 [65 S.Ct. 357, 359, 89 L.Ed. 311, 156 A.L.R. 390].) That the Fifth Amendment takings clause applies to restrictions imposed by rent control ordinances has been acknowledged by the United States Supreme Court since at least 1921. In *Block* v. *Hirsh* (1921) 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165], the court upheld a rent control law applicable to the District of Columbia and made necessary by exigencies of the first World War. In so doing, the majority recognized that rent control regulations could be so restrictive as to amount to a taking. (*Id.* at p. 156 [41 S.Ct. at pp. 459-460].) In *Bowles* v. *Willingham* (1944) 321 U.S. 503, 518 [64 S.Ct. 641, 649, 88 L.Ed. 892], the court upheld a World War II price control act, some provisions of which applied to rental property, stating in reference to those provisions that "the restraints imposed on the national government in this regard by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth."

The protection afforded by article I, section 19 is, of course, even broader than that of the Fifth Amendment. (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 298 [142 Cal.Rptr. 429, 572 P.2d 43].)

It is beyond dispute, therefore, that a rent control regulation that denies due process may also violate the takings clause of the Fifth Amendment, and

---

[1]The court noted in *Yee* that it had never considered whether a mobilehome rent control ordinance like that of the City of Escondido effected a regulatory taking, but refrained from addressing that issue only because the question has not been properly raised. (503 U.S. at p. 538 [112 S.Ct. at p. 1534].) The court expressed no doubt that a rent control ordinance could effect a regulatory taking. (*Ibid.,* see also *Pennell* v. *San Jose* (1988) 485 U.S. 1 [108 S.Ct. 849, 99 L.Ed.2d 1].)

article I, section 19. That being so, it is necessary to determine whether denying plaintiff the right to seek a fair return on his property did so. None of the decisions to which the majority look for identification of the factors relevant to determining whether a taking has occurred support the conclusion that no taking occurred here. It is clear to me that there has been a compensable taking.

In *Penna. Coal, supra*, 260 U.S. 393, a seminal decision in the regulatory taking area, the Supreme Court considered the application of a Pennsylvania statute prohibiting anthracite coal mining in such a manner as to cause subsidence to a parcel of property. The property was subject to a deed executed by a coal company conveying the surface but expressly reserving the right to mine coal. The grantee of the surface interest expressly assumed all risk and waived all damage claims arising from the mining. The court held that application of the statute in these circumstances exceeded the police power of the state and constituted a compensable taking.

In reaching that conclusion the court recognized that property interests must yield "to some extent" to the police power, but this implied limitation on the police power itself has limits imposed by the due process and contracts clauses of the Constitution. When exercise of the police power exceeds those limits, the government must exercise its power of eminent domain and pay just compensation. The "extent of the diminution" of the values incident to property determines when the limits of the police power have been exceeded. (*Penna. Coal, supra*, 260 U.S. at p. 413 [43 S.Ct. at p. 159.) The coal company's reserved mining rights were recognized under Pennsylvania law, and therefore by the high court also, as a valuable estate in land. The extent of the taking was great, as application of the statute abolished that estate. (*Id.* at p. 414 [43 S.Ct. at pp. 159-160].)

In *Penna. Coal* the court stated the general rule which continues to guide regulatory takings jurisprudence: "[W]hile property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking. . . . [A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." (*Penna. Coal, supra*, 260 U.S. at pp. 415-416 [43 S.Ct. at p. 160].)[2]

Subsequent decisions applying and further explicating that general rule make it clear that the property interest at issue here is a valuable right and

[2]The rule actually appears earlier in *Block* v. *Hirsh, supra*, 256 U.S. at page 156 [41 S.Ct. at pages 459-460], the decision in which the court held that rent control, including vacancy control, is not a per se taking. The law in question, applicable to Washington, D.C., property, provided procedures to assure the owner a reasonable rent. There, Justice Holmes explained that rent control is permissible when a public exigency makes that form of land-use regulation necessary. Analogizing rent control to other permissible regulation of property he explained:

that the manner in which the Board applied its rent control ordinance to plaintiff went "too far."

In *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (*Penn Central*), application of a landmark preservation law to plaintiff's property precluded a proposed development of the airspace above an historic railroad terminal building. The law did award transferable development rights to owners of landmark properties that could not be further developed. The court recognized that the availability of those rights was relevant in determining the economic impact of the regulation when deciding whether application of the law effected a taking. (See also *Suitum* v. *Tahoe Regional Planning Agency, supra*, ___ U.S. ___ [117 S.Ct. 1659].) The question before the court was whether denying the owner the right to build above the existing landmark structure constituted a taking. The court again recognized that whether a taking has occurred depends on the circumstances of the individual case, and requires what is essentially an ad hoc, factual inquiry. It identified as a factor to be considered the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." (*Penn Central, supra*, 438 U.S. at p. 124 [98 S.Ct. at p. 2659].)

In applying its takings jurisprudence to Penn Central's property the court refused to consider the interest in airspace in isolation. It explained, "this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block designated as the 'landmark site.' " (*Penn Central, supra*, 438 U.S. at pp. 130-131 [98 S.Ct. at p. 2662].) After rejecting arguments that application of the landmark law to the property had diminished the value of the site and burdened Penn Central more than other property owners subject to it, noting that in these respects, the law was similar to a zoning ordinance, the court turned to the severity of the impact of the landmark law on the parcel as a whole. In concluding that the impact was not such as to constitute a taking the court observed that the law did not interfere in any way with the existing use of the property, thus Penn Central's "primary expectation" about use of the parcel was unaffected. (*Id.* at p. 136 [98 S.Ct. at p. 2665].) It also noted that there had been no determination that all use of the airspace

---

"We do not perceive any reason for denying the justification held good in the foregoing cases to a law limiting the property rights now in question if the public exigency requires that. The reasons are of a different nature but they certainly are not less pressing. . . . All the elements of a public interest justifying some degree of public control are present. *The only matter that seems to us open to debate is whether the statute goes too far. For just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law.*" (*Ibid.*, italics added.)

was prohibited since there had been no application for scaled-down development. Thus in this case there had been no taking because "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit *reasonable beneficial use* of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties." (*Id.* at p. 138 [98 S.Ct. at p. 2666], fn. omitted, italics added.) The court emphasized that this holding assumed Penn Central's "present ability to use the Terminal for its intended purposes and in a gainful fashion." (*Id.* at p. 138, fn. 36 [98 S.Ct. at p. 2666].)

The importance of the right to use one's property in an economically viable manner as the determinative factor in assessing whether a taking has occurred was again emphasized by the court in *Agins* v. *Tiburon, supra,* 447 U.S. 255. There the validity of zoning ordinances which limited the number of homes that could be constructed on a five-acre parcel was challenged. Because the property owners had not sought a development permit, the only question before the court was whether enactment of the ordinances alone constituted a taking. In rejecting the property owners' taking claim, the court stated: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see *Nectow* v. *Cambridge,* 277 U.S. 183, 188 (1928) [48 S.Ct. 447, 448, 72 L.Ed. 842], or denies an owner *economically viable use* of his land, see *Penn Central Transp. Co.* v. *New York City,* 438 U.S. 104, 138, n. 36 (1978) [98 S.Ct. 2646, 2666, 57 L.Ed.2d 631]." (*Id.* at p. 260 [100 S.Ct. at p. 2141], italics added.) Neither occurred as a result of the adoption of the Tiburon zoning ordinances. While they limited development, "they neither prevent[ed] the best use of appellants' land [citation], nor extinguish[ed] a fundamental attribute of ownership [citation]." (*Id.* at p. 262 [100 S.Ct. at p. 2142].)

Here, of course, the holding in *Kavanau I, supra,* 19 Cal.App.4th 730, establishes that plaintiff was not permitted "economically viable" or "reasonably beneficial" use of his property. Application of the rent control ordinance to the property seriously interfered with his, or any owner of rental property's, "primary expectation" about the use of rental property, since the Board did not permit him to earn a reasonable rate of return. Moreover, by denying plaintiff that right, the Board effectively extinguished a fundamental attribute of ownership of rental property.

While the determination of whether a taking has occurred often does require weighing of private and public interests (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 261 [100 S.Ct. at pp. 2141-2142]), outside the realm of measures

necessary to protect life and property (see, e.g., *Miller* v. *Schoene* (1928) 276 U.S. 272 [48 S.Ct. 246, 72 L.Ed. 568]), the balance has never been struck in favor of public interest when governmental action has denied an owner economically viable use of the owner's property.

The importance of the impact of governmental action on the profitability of property in the weighing process appears in *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470 90 [107 S.Ct. 1232, 94 L.Ed.2d 472]. There a state law, which required that 50 percent of extractable coal be left in place under specified structures to protect them against subsidence, was applied to property owned by the petitioners. The high court rejected a facial challenge to the law and distinguished *Penna. Coal, supra,* 260 U.S. 393, on the ground that the petitioners had not shown that their mining operations were not profitable under the restrictions imposed by the law. "The two factors that the Court considered relevant, have become integral parts of our takings analysis. We have held that land use regulation can effect a taking if it 'does not substantially advance legitimate states interest, . . . or denies an owner economically viable use of his land.' *Agins* v. *Tiburon,* 447 U.S. 255, 260 (1980) [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (citations omitted); see also *Penn Central Transportation Co.* v. *New York City,* 438 U.S. 104, 124 (1978). . . . [T]he character of the governmental action involved here leans heavily against finding a taking; the Commonwealth of Pennsylvania has acted to arrest what it perceives to be a significant threat to the common welfare. Second, there is no record in this case to support a finding . . . that the Subsidence Act makes it impossible for petitioners to profitably engage in their business, or that there has been undue interference with their investment-backed expectations." (*Id.* at p. 485 [107 S.Ct. at p. 1242].)

Under any of the high court's formulations of the test or factors relevant in assessing whether a regulatory taking has occurred, there has been a compensable taking in this case. When application of a rent control ordinance to a parcel of property is so arbitrary and unreasonable as to be confiscatory and deny due process, by definition that application has denied the owner all economically beneficial use of the property. When a rent ceiling is constitutionally impermissible because it denies a property owner a fair and reasonable return on the property, the owner's investment-backed expectations have been extinguished as the state has made use of the property "commercially impracticable," an action which constitutes a taking. (See *Penna. Coal, supra,* 260 U.S. at pp. 414-415 [43 S.Ct. at p. 160].)[3] The character of the government action is placement of the burden of assuring

---

[3]An apartment building, unlike undeveloped land, is not amenable to a variety of uses or any alternative economically feasible use.

affordable rental housing, a burden that should be borne by the public as a whole, unfairly on the individual property owner. The owner is denied a reasonable return on his investment in order to benefit tenants. And, because the opportunity to lease property for an amount that will generate a reasonable return on the owner's investment is a fundamental aspect of property ownership, application of a rent control ordinance in a manner which denies the owner that opportunity extinguishes that incident of ownership.

There can be no dispute over the fact that rent control is a taking for public use or common good. Rent control is constitutionally permissible precisely because it is perceived as a means by which the adverse impact on the public of a housing shortage may be cured or mitigated. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 160 [130 Cal.Rptr. 465, 550 P.2d 1001].) "[A] primary purpose of rent control is the protection of tenants." (*Pennell* v. *San Jose, supra*, 485 U.S. at p. 13. [108 S.Ct. at p. 858].) It follows that when a rent ceiling is confiscatory the owner's right to use the property in an economically beneficial way "is being pressed into some form of public service under the guise of mitigating serious public harm." (*Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at p. 1018 [112 S.Ct. at p. 2895].)

Application of the additional factors identified by the majority (maj. opn., *ante*, at pp. 775-776) as potentially relevant in determining whether a constitutional taking has occurred also leads ineluctably to the conclusion that there has been a taking in this case. The contrary reasoning of the majority is not supported by the authorities, discussed above, on which the majority rely. Those factors, in the order addressed by the majority, demonstrate the merit of plaintiff's claim:

1. The regulation of plaintiff's right to seek a reasonable return from his rental property does interfere with a property interest. Contrary to the majority view, the regulation did not simply delay the time at which plaintiff would receive the constitutionally adequate rents to which he was entitled. Application of the Santa Monica rent control ordinance by the Board has already denied plaintiff a fair return on his property. That temporary taking of this fundamental aspect of ownership allegedly cost plaintiff $113,095. Additionally, as his complaint alleges, the delay in receiving what would have been a fair return denied plaintiff the use of that money and interest of $30,956 that could have been earned.

Moreover, even assuming, as do the majority, that the government's obligation to pay just compensation may be shifted to third parties, there is no assurance that plaintiff will ever recoup his losses. It is true that he

received some rental income, but that income was not a fair and reasonable return on the property. The complaint in inverse condemnation seeks to recover the rents that would have assured plaintiff a reasonable return, the amount taken from him by the Board's illegal application of the rent control ordinance.

2. The regulation did affect the existing use of plaintiff's rental property. It interfered to a constitutionally impermissible extent with his primary ownership expectation of receiving a reasonable return from rental property. *Kavanau I, supra*, 19 Cal.App.4th 730, determined this.

3. It may be assumed that Santa Monica has a substantial interest in maintaining an adequate supply of affordable rental units, but that establishes only that the rent regulation is not invalid per se and that plaintiff's property was taken for a public purpose. None of the authorities on which the majority rely suggest that this factor may ever outweigh the denial of an economically feasible use of property for its customary purpose in determining whether a taking has occurred.

4. The regulation did abrogate a substantial interest plaintiff holds in the property—the use of the property to produce a fair and reasonable return on plaintiff's investment. While he still owns the property, when rental property cannot be used to produce a fair and reasonable return, the only alternative to use of it for producing rental income is to sell it at a depressed price. Neither the Fifth Amendment nor article I, section 19 contemplates sale as an alternative economically feasible use. Both protect existing ownership interests.

5. The regulation has taken plaintiff's property to serve a public purpose.

6. It is given that the regulation did not permit plaintiff to earn a reasonable return.

7. Unlike *Suitum* v. *Tahoe Regional Planning Agency, supra*, __ U.S. __ [117 S.Ct. 1659], and *Penn Central, supra*, 438 U.S. 104, which involved use retrictions, here the value of offsetting benefits such as the possibility that future increased rents permitted by the Board will offset some of plaintiff's losses is relevant only to whether just compensation has been paid. The existence of that possibility does not negate the fact that a taking has already occurred.

8. As applied in the past to plaintiff's property, the regulation did prevent the best and only economically feasible use of plaintiff's property, i.e., use to produce a reasonable income from rentals.

9.  The regulation did extinguish a fundamental attribute of ownership—again, the opportunity to rent or lease the property for rents that produce a fair and reasonable return during the period for which damages are sought.[4]

I agree therefore with Justice Mosk, who, in his dissenting opinion in *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 376-377 [228 Cal.Rptr. 726, 721 P.2d 1111], expressed the view that a rent control ordinance which did not permit landlords with "hardship tenants" the same rental increases otherwise allowable, denied those owners a reasonable return on the property and thereby imposed on the owner what should be a public burden. The ordinance, he reasoned, created "forced subsidy imposed on the landlord in violation of the due process clauses of the United States and California Constitutions, which prohibit the taking of property without just compensation." (*Id.* at p. 377.)

II

## The Rental Increase Alternative to an Inverse Condemnation Remedy

The majority apparently assume that plaintiff's rental units are and will continue to be occupied by some tenants who enjoyed the benefit of past impermissibly low rents. Therefore, the majority reason, we may justify compelling those tenants to pay rents which exceed the amount necessary to ensure plaintiff a reasonable return in order to reimburse plaintiff for what the government took.[5] Additionally, new tenants who pay market rate rents will help to reimburse him since those rents also exceed the amount necessary to ensure a reasonable return. Because plaintiff may recover his losses in this manner, there has been no taking and there is no need for an inverse condemnation remedy. Again, I disagree.

The taking has already occurred. Plaintiff has already lost almost $150,000 because of the Board's action. Both the Fifth Amendment and article I, section 19 impose the obligation to pay just compensation on the governmental entity that takes an owner's property. Moreover, assuming either (1) that the availability of rent increases might create a benefit

[4]The 10th factor identified by the majority—permit-related requirements—is not involved here.

[5]This assumption assumes in turn that rental increases sufficient to offset plaintiff's loss are permissible under Civil Code sections 1954.50 through 1954.53, the Costa-Hawkins Rental Housing Act which, while abrogating local limits on rent increases for vacant rental units, also contains a transitional limit for vacancies in rent controlled units of 15 percent more than the prior rental rate or 70 percent of the prevailing market rent. (Civ. Code, § 1954.53, subd. (c).)

adequate to permit a conclusion that there has been no taking, or (2) that the obligation to pay just compensation for a taking may be satisfied by shifting the burden to tenants through extraordinary rental increases, there is no assurance here that any present tenants on whom those increases fall will remain and pay the authorized increases. The majority's assumption that they will do so is unfounded. Also unfounded is the assumption that because plaintiff is allowed to raise the rent for vacant units, he will be able to recover his past losses from new tenants. The higher, presumably market rate, rents paid by new tenants are those which plaintiff would receive in any event since vacant units are no longer subject to rent control except to the extent that the preemptive state law imposes transitional limits. By no stretch of the legal imagination do these higher rents include a premium that will reimburse plaintiff for the past rental income which the Board wrongfully denied him.[6]

Thus, the majority's holding that increasing the rents allowed for plaintiff's rental units is an adequate alternative to an action in inverse condemnation, rests entirely on speculation that plaintiff will someday recover the amount he allegedly lost from past tenants who will remain tenants even though the permitted rent increases will of necessity fix their rents at a figure above that otherwise permitted. It should be apparent to all that this illusory alternative remedy will not and cannot be considered an offsetting benefit that mitigates plaintiff's loss and relieves the Board of its obligation to pay for taking plaintiff's property. The increased rents "remedy" neither precludes a finding that there has been a taking nor satisfies the constitutional command that just compensation be paid when a taking occurs.

The judgment dismissing plaintiff's cause of action for inverse condemnation should be set aside. For that reason, I would reverse the judgment of the Court of Appeal.

Brown, J., concurred.

---

[6]It might be argued that because market rate rents in a tight rental market exceed a fair return on investment, the amount of that difference balances the losses suffered by an owner of rent regulated rental property when rents are set too low—i.e., the overall return meets the fair and reasonable return criterion. It does not follow, however, that receipt of market rate rental income to which the owner is entitled when a vacancy occurs, may be treated as compensation for past losses. Income which would be received in any case does not replace lost income.