BROWN, J., Dissenting.—
In this case, we decide whether and in what circumstances 42 United States Code section 1983 (section 1983) provides a remedy for an unconstitutional and confiscatory restraint on prices—an issue the United States Supreme Court has not definitively resolved. The majority holds that, before a plaintiff may obtain damages under section 1983, he or she must first exhaust administrative remedies by seeking regulatory relief from the same agency that imposed the confiscatory price regulations in the first place. Moreover, this exhaustion requirement applies even where unfairness in the administrative hearing process was the source of the constitutional injury. This conclusion directly contravenes Patsy v. Florida Board of Regents (1982) 457 U.S. 496 [102 S.Ct. 2557, 73 L.Ed.2d 172] (Patsy), an inconsistency that is only explainable in terms of the reduced importance the majority gives to the constitutional interest that is at stake. Thus, in the latest of a series of decisions rejecting the claims of property owners, this court now refuses to enforce federal civil rights remedies when it comes to confiscatory regulations. I respectfully dissent.
*1046 Introduction
Sometimes, whether because of bias, incompetence, political expediency, bureaucratic malice, or some combination of oppressive practices, administrative agencies prove themselves incapable of regulating private affairs in a way that comports with fundamental justice. The City of Clovis (Clovis) subjected the Gallands to a rent adjustment procedure that was so “time-consuming, burdensome, and expensive” as to deprive them of due process of law. Frustrated by the patent unfairness of this administrative process, they sought recourse from the courts, and the trial court, recognizing the gross injustice that had occurred, awarded the Gallands compensation. The Court of Appeal affirmed. We now intervene to eviscerate a federal civil rights remedy whose very purpose is to provide an alternative to abusive or corrupt state adjudicative procedures like those the Gallands had to endure and to announce a new due process standard that has never applied to rent control.
It is long settled that a rent control scheme is confiscatory and violates due process if it is not “capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary.” (Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129, 169 [130 Cal.Rptr. 465, 550 P.2d 1001] (Birkenfeld).) The majority rejects this standard, noting that Birkenfeld involved a facial challenge to a rent control scheme, whereas the Gallands are seeking “damages resulting from . . . the rent-setting process itself.” (Maj. opn., ante, at p. 1039.) But if a rent control scheme is unconstitutional on its face for failing to provide a streamlined rent adjustment procedure, then it is all the more unconstitutional when a concrete factual record establishes the scheme’s inefficiency and inadequacy in practice. Surely, if Clovis had adopted regulations outlining all the convolutions of the rent adjustment procedure it imposed on the Gallands, including the unexplained delays and shifting demands for information, then those regulations would have been facially unconstitutional under Birkenfeld The fact that Clovis kept its arcane procedures secret, even seeming to make them up as it went along, certainly does not militate a different conclusion in Clovis’s favor.
Clovis said to the Gallands, in effect: Before you can raise rents, you must prove you’re not making too big a profit, and we will make it impossible, as a practical matter, for you to meet this burden of proof. The Gallands responded to Clovis’s regulatory arrogance in much the same way as Lewis Carroll’s Alice did when she found herself in a similar situation: “ 'I don’t think they play at all fairly,’ Alice began, in rather a complaining tone, ‘. . . and they don’t seem to have any rules in particular; at least, if there are, *1047 nobody attends to them—and you’ve no idea how confusing it is . . .' " (Carroll, Alice’s Adventures in Wonderland (1985 ed.) p. 115.) To which the majority replies: Go back and try again.
The “Kavanau Adjustment” Does Not Supplant Section 1983
In Kavanau v. Santa Monica Rent Control Bd. (1997) 16 Cal.4th 761, 782 [66 Cal.Rptr.2d 672, 941 P.2d 851] (Kavanau), this court held that future rent adjustments can compensate for past confiscatory rents, thus dispelling any due process violation that may have occurred in that case and making it unnecessary for us to decide whether a due process violation constitutes a per se taking requiring just compensation under the state and federal takings clauses. The majority now extends Kavanau far beyond its original modest scope, concluding, in a very different factual context, that the possibility of future rent adjustments precludes a section 1983 action. (Maj. opn., ante, at p. 1025.)
The differences between this case and Kavanau are manifest. First, Kavanau involved a highly idiosyncratic fact pattern. In that case, Earl Kavanau had challenged the constitutionality of a 12 percent per year cap on rent increases. The cap did not prevent landlords from imposing very large rent increases, but it required those rent increases to be phased in over a number of years. That regulation was relatively modest as compared to the obstructionist practices of Clovis in this case. Nevertheless, a lower court had found that the 12 percent cap violated due process and that judgment was final. We had before us Kavanau’s subsequent takings claim based on the time period during which the 12 percent cap was in effect. The Kavanau majority did not believe that the 12 percent cap constituted an actual due process violation or a taking (Kavanau, supra, 16 Cal.4th at pp. 779-781), but needed to address Kavanau’s argument that the previous judgment in his favor entitled him automatically to a finding of a taking requiring just compensation. (Id. at p. 781.) In short, we needed to determine the effect in takings law of a due process judgment that we thought was wrong. In that unusual and convoluted context, the Kavanau majority reasoned that the relatively minor, if any, confiscation that may have occurred as a result of the due process violation could easily be dispelled through future rent adjustments, and therefore a takings clause remedy was inappropriate. It is one thing to reach the conclusion we reached in Kavanau that future rent adjustments can dispel a minor (or nonexistent) due process violation and thus obviate a related takings claim. It is quite another thing to extend that same conclusion to all due process violations, no matter what their scope or procedural posture.
Second, Kavanau was based on circumstances unique to takings jurisprudence. For example, we noted that under established takings law a court *1048 must consider the “ ‘reciprocity of advantage’ ” that a party receives from a regulation of property before determining that a taking has occurred. (Kavanau, supra, 16 Cal.4th at p. 782.) In light of that principle, the Kavanau majority concluded that the possibility of future rent adjustments was a potential benefit that negated Kavanau’s takings claim, at least at the stage of the proceeding that was then before us. No similar “ ‘reciprocity of advantage’ ” (ibid.) principle applies under the due process clause. In this sense, our decision reflected principles of takings law that simply do not apply here.
Third, in Kavanau we made a specific finding that the rent control scheme at issue in that case was sufficiently flexible to allow the agency to take past confiscatory rent levels into account when setting future rent levels. (Kavanau, supra, 16 Cal.4th at p. 784.) The majority makes no similar finding here.
Fourth, Kavanau was not a case in which the agency’s ability to provide a fair rent adjustment procedure was brought into question. Rather, the agency had merely enforced a 12 percent cap that turned out to be confiscatory. Here, on the other hand, flaws in Clovis’s rent adjustment mechanism are the very basis of the due process claim. In this circumstance, it defies logic to impose the remedy of further rent adjustment proceedings. Further administrative proceedings cannot possibly compensate for an injury caused by excessive administrative proceedings. In Kavanau, we acknowledged that the remedy of future rent adjustments might prove to be inadequate, in which case other remedies would be appropriate. (Kavanau, supra, 16 Cal.4th at pp. 782-783.) Here, the remedy of future rent adjustments is inadequate as a matter of law in light of Clovis’s past conduct.
Finally, and most importantly, Kavanau did not involve a section 1983 claim. Section 1983 arose out of the sad failure of southern states in the aftermath of the Civil War to enforce the federal Constitution and protect basic civil rights. (Wilson v. Garcia (1985) 471 U.S. 261, 276-277 [105 S.Ct. 1938, 1947-1948, 85 L.Ed.2d 254].) A long series of high court precedents have bolstered the section 1983 remedy, precedents the majority would no doubt vigorously defend. The thrust of these decisions is that, far from relegating plaintiffs to the same corrupt system that inflicted their injury, section 1983 exists to give plaintiffs an adjudicative alternative that will ensure protection of their rights. (See, e.g., Zinermon v. Burch (1990) 494 U.S. 113, 124-125 [110 S.Ct. 975, 982-983, 108 L.Ed.2d 100]; Felder v. Casey (1988) 487 U.S. 131, 147-148 [108 S.Ct. 2302, 2311-2312, 101 L.Ed.2d 123] (Felder); Patsy, supra, 457 U.S. at pp. 502-507 [102 S.Ct. at pp. 2560-2563].) Therefore, as the high court stated in Felder at page 147 *1049 [108 S.Ct. at page 2311], “there is simply no reason to suppose that Congress . . . contemplated that those who sought to vindicate their federal rights . . . could be required to seek redress in the first instance from the very state officials whose hostility to those rights precipitated their injuries.” The majority can only avoid the clear instruction of these precedents if it can somehow find that no constitutional violation occurred here. Thus, in a formidable example of judicial sleight of hand, the majority argues, in effect,, that a due process violation is not a due process violation. The majority reasons, by analogy to Kavanau, that there may be no due process violation when rents are averaged over a number of years. (Maj. opn., ante, at pp. 1023-1025.) Therefore, even if there is a manifest due process violation during a particular year (or even a series of years), that due process violation may disappear when future years are taken into consideration. Now you see it; now you don’t.
The majority’s interpretation of due process law is in error. It is true that, after the fact, a regulatory scheme may prove nonconfiscatory when the returns in a few years are averaged together, but that concession is very different from holding that in a particular confiscatory year (or after a series of confiscatory years) an investor may not pursue federal remedies and instead must wait and hope that the confiscatory regulations will be sufficiently relaxed in the future to make up the difference. How long must the investor wait? The Gallands have so far had to wait almost 13 years, and the majority tells them to keep on waiting. Certainly, if we infinitely expand the number of years that may be averaged together, there is always the possibility that future rent adjustments will compensate for past confiscatory rent levels. Must a business enterprise prove it is on the verge of bankruptcy before it can obtain relief? Even then, would the majority deny relief, arguing the business was undercapitalized? In effect, the majority holds that investors must bear the brunt of a confiscatory regulation by providing a business with sufficient capital to survive a series of lean years. But constitutional protections should not (and do not) prefer large business enterprises over small ones.
I doubt the majority would be so quick to eviscerate section 1983 in a classic civil rights case. Suppose a Black firefighter were denied promotions and raises in a city with a long history of discrimination against Blacks, and the trial court awarded damages under section 1983. Would this court reverse and tell the firefighter: You have no remedy under section 1983; instead, you have to go back to the city and petition for extra promotions and raises that will diffuse the incipient constitutional violation? Or, to make the comparison to this case more precise, what if a city discriminated against a Black-owned business in the award of city contracts? Assuming the business *1050 was sufficiently capitalized to survive a series of lean years, would we deny a section 1983 claim and tell the business to petition for extralucrative contracts in the future to “ ‘dispel[]’ ” the past discrimination? (Maj. opn., ante, at p. 1023.) It is no answer to say that this case concerns merely an economic injury and that race is a “suspect class” requiring different treatment under the Constitution from price regulation. (Id. at p. 1024, fn. 3.) Arbitrary and unfair treatment by the government is not merely an economic injury; it is also, like race discrimination, an affront to personal dignity. While the standards for finding a constitutional violation may differ, the Constitution does not establish a hierarchy of rights in which some are deemed more worthy of protection than others.
Moreover, as the race discrimination examples illustrate, what is essentially an exhaustion requirement cannot be disguised by the simple trick of redefining the constitutional right so no violation occurs until after administrative remedies have been exhausted. To do so would render the holding in Patsy meaningless. Here, for example, the administrative adjustment of future rents is unquestionably remedial, not preventive. It follows a judicial finding that the administrative agency’s rates are “confiscatory” (maj. opn., ante, at pp. 1008, 1023, 1025, 1028-1029), and its express purpose is to “compensate” (id. at pp. 1008, 1021, 1024, 1029) for the confiscation, thereby ensuring a fair return on investment. Moreover, in light of the intervention of a reviewing court, the adjustment of future rents cannot be characterized merely as an ordinary part of the rate-setting process. Not surprisingly, in Kavanau we expressly referred to this adjustment as a “remedy.” (Kavanau, supra, 16 Cal.4th at pp. 767, 782-786.) Indeed, the only reason to characterize it in other terms is to avoid the mandate of Patsy. Perhaps conscious of the weakness of its conclusion in this regard, the majority euphemistically refers to this remedy as the “Kavanau adjustment” (maj. opn., ante, at p. 1008), though the majority concedes it is really a “remedy.” (Id. at pp. 1023, 1025, 1029, 1040.)
But whether we use the term adjustment or remedy, a fair resolution of a constitutional breach cannot include sending an aggrieved party back to the same administrative system that caused the injury in the first place. On the contrary, the driving purpose of section 1983 is to get the plaintiff out of the corrupt state system where constitutional rights are being violated and into federal court where wrongs can be fairly redressed. (Patsy, supra, 457 U.S. at pp. 503-505 [102 S.Ct. at pp. 2561-2562].) Although the Gallands have opted to pursue their section 1983 claim in state court, the principle no less applies. (Felder, supra, 487 U.S. at p. 147 [108 S.Ct. at p. 2311].) The essence of section 1983 is to liberate a plaintiff from an abusive adjudicative mechanism, which Clovis’s rent adjustment procedure has unquestionably *1051 proved itself to be. “A state law that conditions th[e] right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of [section 1983], is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law.” (Felder, supra, 487 U.S. at p. 153 [108. S.Ct. at p. 2314].) Thus, instead of the judicial oversight that section 1983 was intended to afford, we now have judicial abdication, while plaintiffs are left to grind away at the state administrative level.
Moreover, the remedy of adjusting future rents is unfair in its operation, except perhaps in a case like Kavanau where the due process violation is negligible or nonexistent. Here, it is Clovis that violated due process, not the tenants, and Clovis should pay the damages. This is particularly true, because the source of the violation was in large part the imposition of excessive procedural costs that did not benefit the tenants. (Cf. Kavanau, supra, 16 Cal.4th at p. 784 [finding it appropriate for tenants who benefited from unconstitutionally low rents to bear the burden of the remedy].) Unless we place the burden of the remedy on Clovis, we create no disincentive to prevent the sort of regulatory abuse that occurred here. Under the majority’s opinion, a city, when regulating economic affairs, is pretty much free to disregard the due process rights of politically disfavored parties, and if questioned on this behavior—which may never happen, considering the extraordinary efforts the Gallands had to exert in order to finally get a fair hearing—the city merely has to ease up on its regulations. Moreover, if the regulations continue to be confiscatory, which is not unlikely in light of the political forces that gave rise to the initial confiscation, it is “déjà vu all over again.” (Araiza et al., The Jurisprudence of Yogi Berra (1997) 46 Emory L.J. 697, 714.) The aggrieved party is back to square one, with more lengthy and burdensome administrative proceedings, more writ petitions, and more appeals.
Thus, under the majority view, landlords now have to win twice, first proving in court that the rent control scheme was confiscatory, then proving in a second court proceeding that the regulatory relief offered by the agency was inadequate. Meanwhile, new claims may well arise while prior claims are being adjudicated, remedied, and then readjudicated. The claims cannot be resolved as fast as they arise, creating a sort of “feedback loop” in which justice for landlords is the ever-receding dream. In this case, for example, we have dipped into a 13-year-old proceeding, made some solemn pronouncements, and then turned our attention to other matters, but for the Gallands, it is a quest for justice that will never end.
All of these concerns lead me to wonder if we took the wrong turn long ago when we began treating rent control like any other price-regulated *1052 industry. The result of that decision has been to obscure injustices that may not arise in the context of utility rate regulation but do arise where regulations affect private transactions in residential property. Landlords are not producers of a commodity, they are owners of real estate, and the state’s action in enforcing rent control looks much more like an exercise of the sovereign’s power of eminent domain than an exercise of its police power. In short, the unique issues that arise in the context of real estate warrant unique treatment of rent control under the Constitution. While it may be too late to change direction at this point, we should at least exercise the caution of magistrates and conserve what we can of constitutional constraints.
The Substantive Due Process Standard
Having found no confiscation, the majority turns to whether the “ ‘bureaucratic bungling’ ” (maj. opn., ante, at p. 1036) that occurred here independently constituted a violation of substantive due process. The majority weighs various substantive due process standards, including “ ‘ “arbitrary” ’ ” (id. at p. 1031), “ ‘shocks the conscience’ ” (ibid., italics omitted), and “outrageous or egregious” (id. at p. 1032), but finally settles on “ ‘a deliberate flouting of the law’ ” (id. at p. 1034, italics omitted) as the appropriate verbal formulation. In so doing, the majority unnecessarily complicates the question before us. These various standards may be valid, but they are all subsumed within the more specific standards that apply in the context of price regulation (see, e.g., Power Comm’n v. Hope Gas Co. (1944) 320 U.S. 591, 602-603 [64 S.Ct. 281, 287-288, 88 L.Ed. 333] (Hope Gas); Power Comm’n v. Pipeline Co. (1942) 315 U.S. 575, 584-585 [62 S.Ct. 736, 742-743, 86 L.Ed. 1037]), including the standard we articulated in Birkenfeld that a rent adjustment mechanism may not be prohibitively burdensome (Birkenfeld, supra, 17 Cal.3d at p. 171) or fraught with “a substantially greater incidence and degree of delay than is practically necessary.” (Id. at p. 169.) Putting the point another way, a rent adjustment mechanism that does not satisfy Birkenfeld is by definition a deliberate flouting of the law in violation of due process—the law in question being the constitutional right of investors to a fair return. In this regard, it is also worth noting that Clovis had ample opportunity to reflect upon its decisions, and therefore, as the majority concedes (maj. opn., ante, at p. 1032), it is held to a stricter standard under the due process clause.
The majority’s casual sidestepping of Birkenfeld flows, I think, from a basic conceptual error. The majority divides the Gallands’ right to relief into categories based on the damages the trial court awarded. Thus, the majority treats the allegation that the rent control scheme was confiscatory separately from the allegation that the rent adjustment procedure was unfair. But *1053 Birkenfeld holds that an unfair, burdensome, and slow rent adjustment procedure is one of many ways a rent control scheme can be confiscatory. (Birkenfeld, supra, 17 Cal.3d at pp. 169-171; see also maj. opn., ante, at p. 1040.) Moreover, the costs associated with such a rent adjustment procedure are one of the operating expenses that the regulatory agency must take into consideration when determining fair return. (Maj. opn., ante, at pp. 1027-1028, 1040.)
In short, the majority’s categories collapse into one another. We do not" have before us a trial court finding of two separate injuries for which we must articulate separate legal standards. Rather, we have before us a single finding that Clovis’s unfair, burdensome, and slow rent adjustment procedure rendered the rent control scheme confiscatory both by increasing the Gallands’ costs and by preventing or delaying meritorious rent increases. Pursuant to this one finding, the Gallands were entitled to recover the high costs they incurred complying with the unfair procedure and also the additional amount necessary to bring their actual return on investment up to the level of a “fair return” (maj. opn., ante, at p. 1021), and this remedy is what the trial court awarded.
Having unnecessarily divided the Gallands’ right to relief into categories, the majority addresses Clovis’s abusive rent adjustment procedure without reference to price regulation cases such as Birkenfeld, relying instead on. substantive due process standards that fit this case imperfectly (maj. opn., ante, at pp. 1031-1036) and the law governing administrative subpoenas. (Id. at p. 1037.) The majority then compounds its error by articulating a new “prospective rule” requiring writ proceedings to remedy any future abuses in rent adjustment processes. (Id. at p. 1036.) This prospective rule, like the rule requiring the Gallands to pursue future rent adjustments to remedy past confiscatory rent regulation, conflicts with Patsy, supra, 457 U.S. 496, by forcing the victims of a constitutional breach to exhaust state law remedies prior to pursuing section 1983 remedies.
Further Proceedings After Remand
Finally, I offer a few comments so that the error of the majority opinion is not further compounded after remand. The majority does not in principle bar recovery of all the amounts the trial court awarded, including costs associated with Clovis’s unfair rent adjustment procedure, lost rental income (to the extent rents did not provide a fair return), prejudgment interest, postjudgment interest, and costs and fees associated with the judicial proceedings. All these losses are theoretically recoverable under the majority’s opinion if adequately proved. The majority merely holds that the trial court must apply *1054 the deliberate-flouting-of-the-law standard and that lost rental income (including associated interest) must be recovered through future rent adjustments.
Significantly, the majority’s rule requiring writ proceedings to remedy future abuses in rent adjustment procedures (maj. opn., ante, at pp. 1036-1037) is prospective only. Therefore, the trial court in this case can still award section 1983 damages, interest, and attorney fees if it concludes Clovis’s unfair rent adjustment procedure deliberately flouted the law (maj. opn., ante, at p. 1040), which I think it did—the law in question being the constitutional right to a rent adjustment procedure that is not prohibitively burdensome or fraught with unreasonable delays. (Birkenfeld, supra, 17 Cal.3d at pp. 169-171.) In this regard, we must consider that the rent adjustment procedure at issue here cost significantly more than the rent increases the Gallands were seeking, and its costs are still mounting. Because these costs can be passed through to tenants (maj. opn., ante, at pp. 1027-1028, 1040), Clovis’s actions merely generated future rent increases bigger than the ones under consideration. That sort of senseless regulatory conduct can only be explained as a deliberate flouting of the law, and an award of section 1983 damages is appropriate. Having won compensation for the high cost of the rent adjustment procedure, the Gallands can then petition for future rent increases that will not only assure a fair return in the year of the petition but also fully compensate them (including interest if necessary) for lost income resulting from the confiscatory rent ceilings the trial court already identified.
The majority discusses flaws it perceives in the trial court’s measure of damages (maj. opn., ante, at pp. 1037-1038), arguing that a rent adjustment procedure may be inefficient and expensive without being unconstitutional, and therefore damages should not be determined by comparison to the cost of an ideal procedure. (Id. at p. 1037.) First, I note Clovis did not raise this issue in its petition for review. Furthermore, all this discussion is, in a sense, beside the point. The Gallands are entitled under the Constitution to a fair return over and above their costs, including the cost of the unfair rent adjustment procedure. (Id. at pp. 1027-1028, 1040.) Therefore, whatever portion of this cost they do not recover as a damage award, they can recover through future rent adjustments. (Id. at p. 1040.)
Moreover, I think the majority is wrong as a legal matter to limit damages as it does. The exacting constitutional standard for establishing a due process violation should not serve to restrict damages once the high threshold is met. Rather, once the threshold is met, damages should be sufficient to compensate the plaintiff fully for the constitutional wrong, as well as to create the *1055 appropriate disincentive for the state. Would the majority argue in a tort case that the damages for negligence are not the full amount necessary to compensate the plaintiff for the injury, but rather some discounted amount that accounts for injuries the defendant might have inflicted without acting negligently? Obviously not. Accordingly, I think the difference between the actual cost of the unconstitutional proceeding and the projected cost of a reasonably efficient proceeding was an appropriate measure of economic damages for the trial court to apply. Because the issue was not raised in the petition for review, and in light of the majority’s decision to remand on the question of liability (maj. opn., ante, at p. 1039), I take its discussion of the measure of damages (id. at pp. 1037-1039) to be dictum, despite the majority’s assertions to the contrary. (Id. at p. 1038, fn. 9.) I do not see how the majority can remand on the question of liability and nevertheless have its discussion of damages be “necessary to [its] holding.” (Ibid.)
The majority also questions the trial court’s assumption that 20 to 25 percent per year represented a fair return in this case. (Maj. opn., ante, at pp. 1025-1027.) While much of this discussion is valid, I disagree that a confiscatory taking occurs “ ‘only when the owner has been deprived of substantially all reasonable use of the property.’ ” (Id. at p. 1026, quoting Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 686 [209 Cal.Rptr. 682, 693 P.2d 261].) That statement has been repudiated by subsequent decisions of the high court, as well as this court. (See, e.g., Kavanau, supra, 16 Cal.4th at p. 774.) Moreover, even for a regulated industry, a return of 20 to 25 percent is not per se excessive. Rather, it may be appropriate if the business enterprise is particularly risky or a high return is otherwise necessary to attract capital. (Hope Gas, supra, 320 U.S. at p. 603 [64 S.Ct. at p. 288].) A seemingly high return may also be appropriate if, as occurred here, the trial court defines initial investment as down payment absent borrowed capital, rather than as total investment from all sources. On the other hand, a return matching the return of readily available certificates of deposit would presumably be confiscatory, because it would not compensate investors for the comparatively greater uncertainty, aggravation, and lack of liquidity associated with renting residential property. Because of these complexities, I would defer to the trial court’s resolution of this factual question.
Finally, I think it important to emphasize that Clovis must change its behavior or risk an even larger damage award. If, in the course of future rent adjustment proceedings, Clovis continues to interpose unfair procedural obstacles or does not permit adequate rent increases to assure a return that will offset any confiscatory returns the Gallands already suffered (including, if necessary, interest), or if market forces will not permit the Gallands to recoup their losses within a reasonable period of time, they can return to the *1056 courts and allege both section 1983 and takings claims. (Maj. opn., ante, at pp. 1028-1029; see also Kavanau, supra, 16 Cal.4th at pp. 782-783, 785.)
Conclusion
Section 1983 is supposed to stand as “a guarantor of the basic federal rights of individuals against incursions by state power.” (Patsy, supra, 457 U.S. at p. 503 [102 S.Ct. at p. 2561].) The real mischief of the majority’s opinion lies in its disparate treatment of property rights when enforcing section 1983. Fair and nonconfiscatory price regulation is not such a slippery thing that it should be subject to vastly different treatment from other constitutional values. The Constitution bespeaks no hierarchy of rights, no preferences with respect to its constraints on government action, no partiality among its protections of liberty. Nevertheless, today’s majority consigns economic rights to a secondary status that can only reflect opposition to the balance the framers carefully struck between public and private power.
Respondents’ petition for a rehearing was denied March 21, 2001, and the opinion was modified to read as printed above. Baxter, J., did not participate therein. Brown, J., and Jones, J., were of the opinion that the petition should be granted.